Geiger et al. vs. Filor et al.—Statement of Case.

John H. Geiger and others, Appellants, vs. James Filor and others, Appellees.

1. The law of 1856, to benefit commerce, was not designed to give to the original proprietor of a city, or to the vendees of his right to the streets, the land between high and low water mark at their termination. By the law, this belongs to the city so long as the street exists, with a right to the owners of lots afterwards on its abandonment.

2. Neither railroads nor wharves are nuisances *per se.* They may become so without proper regulation or restriction.

3. Wharves may be constructed by a city, either by direct construction on its own part or by contract with others, giving them the revenue for a period of time to compensate for the erection.

4. An injunction refused, under the circumstances of this case, to the erection of a railroad and wharf.

This case was decided at Tallahassee.

Appeal from Monroe Circuit Court.

On the 28th day of November, 1854, a contract was entered into between the city of Key West, by John W. Porter, Mayor of said city, of the first part, and John H. Geiger, D. Davis and Hiram Benner, of the second part, as follows, viz:

"That the said party of the first part do hereby grant unto the party of the second part, their administrators and assigns, the privilege and use of the westerly end of Green street, on the Island of Key West, for the purpose of building a city wharf, extending to the channel of the harbor, together with the privilege of laying and using a railroad track from said wharf along said Green street to the junction of Duval street, for the better convenience of transporting goods, in connexion with the privilege of said wharf; that the building of said wharf shall be commenced within six months from the date hereof, and that the said party of the second part, their administrators and

assigns, shall be entitled to all the emoluments arising from wharfage, rent, or other legal income of said wharf and privileges, for the term of ten years; and the said party of the second part, in consideration of the foregoing privileges, do hereby bind themselves, their administrators and assigns, to deliver said wharf to the said party of the first part, at the expiration of the aforesaid term of ten years from the date hereof."

Afterwards, a petition of sundry citizens of Key West was presented to the City Council, praying that the resolution and action granting said lease (or agreement) be re-scinded, and that they cause the lessees (or parties obtaining the privilege therein granted) to be notified thereof; in which petition they allege, among other things as grounds for the prayer thereof, that at the meeting of Council on the 27th of November, 1854, at which all the Aldermen were not present, the resolution making said grant was passed, for which no valuable consideration was to be made; that the said lease was made without notice to the public, without consideration and only seven days before the day of election for a new set of Aldermen and Mayor, and bears upon its face manifest injustice to the city; that the Mayor and Aldermen had exceeded their authority in the making of said lease, and, if the design of obstructing the streets in such manner be persisted in, the citizens at large will entirely lose the use and benefit now derived from their existence. The appropriation of said streets to private use will be in violation of the faith upon which all sales of lots upon it were made and would be as illegal as it was injurious.

The subsequent Council, to whom this petition was presented, adopted the following resolution:

*Resolved*, That there is no power vested in the Mayor and Aldermen to grant said lease; that they should have

consulted the people as to the expediency and propriety, and should have given due notice thereof, in order that an opportunity mig ⸱ have been offered for fair and open competition; that they have no right to select individuals amidst citizens and grant them, without notice, peculiar privileges, to the common injury of all. And we believe, under existing circumstances, if these streets be diverted from the people to the purposes of private gain, the citizens will utterly lose the use and benefit of the streets. We deem it our duty to express our dissent to the same by declaring that the lease signed by Jno. W. Porter, Mayor of the city, on the 28th day of November last, be and the same is hereby declared null and void and of no effect whatever; and, should the said parties, or any of them, attempt to obstruct the said street or streets by virtue of the power pretended to be vested in them by said lease, then the city authorities shall use all lawful means to prevent them.

The Island of Key West was originally granted by the Spanish crown, in absolute property, to one Juan P. Salas and by him sold to John W. Simonton, a citizen of the United States. The said grant was afterwards confirmed by commissioners duly appointed by the Government of the United States. In laying out the city of Key West, the proprietors did not make to the city any conveyances of the streets, but left unsold and unoccupied certain highways, to be used as streets, retaining in themselves the title and fee simple ownership. Green street is one of the highways left unsold, the fee in which remained in the proprietors of the Island. This street runs to and connects with the waters of the harbor. Afterwards, the fee in Green street, which had remained with the proprietors of the Island, was conveyed in trust for the benefit of Jas.

10

Filor and the other complainants, from a point twelve feet above high water mark, in a direct line, to the channel of the harbor.

James Filor and others filed their bill of complaint against John H. Geiger and others, praying that the defendants may be enjoined from proceeding to erect, construct and build a wharf at the end of said Green street, or from laying a railway along said street, or in any manner obstructing the free and unrestrained enjoyment of said street in its use as a street or highway, and that the lease granted and agreement made by the City Council with the defendants be adjudged illegal and void. The bill, among other things, alleges, that the complainants, who are owners of the soil on the Southeast side of said Green street, became the purchasers in reference to the benefits and advantages arising from its location on said street, and that to lay a railway along said street would be to defeat the objects for which they made the purchase, to greatly injure and impair the value and desirableness of their property and otherwise greatly to injure and oppress them; that at the present time a city wharf is wholly useless and unnecessary; that there are now in the city of Key West more wharves than the conveniences of the corporators and citizens and the wants of commerce require; that the said wharf, if constructed, will pass into the hands of private individuals for the term of ten years, then only to be given up for the benefit of the citizens and corporators; that during that entire period the citizens and corporators are to be deprived of the use and enjoyment of said street, to be repaid by the uncertain benefit to be derived from a wharf that may, when possessed, be utterly valueless and unnecessary.

The bill further alleges, that the said City Council had no right, power or authority to divert the use of the said

street and highway from the public to private purposes without the consent of the corporators, or a majority of them, and without securing to the corporators an adequate consideration and benefit for the privilege granted; that said City Council have improvidently granted to the said parties the privilege for the period of ten years without securing to the city any guarantee as to the nature and character of the wharf to be erected and constructed; that Green street is only fifty feet wide, and the said parties will be unable to erect a wharf for any useful purpose without encroaching upon and invading the rights of your orators, the owners of the soil on the one side, or of the United States, the owners and occupiers of the soil on the other; that the said contract made and entered into by the said City Council does not secure to the city of Key West the erection and construction of a permanent, useful and durable wharf, to be approved of and accepted by the city, nor does it provide for the reconstruction of said wharf in the event of fire or destruction by storm; that no adequate security is taken from the parties for the faithful execution and performance of their contract, and, after ten years enjoyment of the privilege granted, the city may find itself without a wharf, or with one of little or no value.

In a supplemental bill filed by complainants, they allege that said John W. Simonton and others, who purchased the Island from the Spanish grantee, established lots, squares and streets, sold said lots with reference to said streets, whereby said streets were dedicated to public use; but that said proprietors and town-makers did not convey any title whatever in or to the said streets, and that, notwithstanding the growth and progress of said city of Key West, the fee simple title in and to all those lands used as streets remained in the said Simonton and his

associates, who held the Island and city with him; but that, long after the establishment of said town, to wit: in the year one thousand eight hundred and fifty-five, the heirs and assigns of John W. Simonton and of said owners of said Island and city, did sell and convey unto your orators, for a valuable consideration, the fee simple title of, in and to the streets of the said city; that the pretended grant by the City Council to the defendants, by diverting the said street from the public use, to which it had been dedicated by the aforesaid Simonton and his assigns, and granting it to a private use, was in effect the surrender of the franchise and use of said street to the original proprietors, who had never parted with the fee thereof, in fraud of the rights of the corporators, and that a new City Council, elected subsequent to said grant, upon the petition of certain corporators of said city, did annul and cancel, after full, deliberate and patient investigation thereof, the aforesaid grant to the defendants, of which the defendants had due notice before they had in any way proceeded under the said grant; that your orators are the true, legal and *bona fide* owners of the fee simple of all the lands in the city of Key West, in Green street and its other streets, which lie between low water mark and a line drawn twelve feet above high water mark, and are entitled to have, exercise and enjoy all the rights, privileges and immunities thereunto belonging as fully as were the original proprietors of the said city aforesaid; that the Legislature of the State of Florida, in December, 1856, passed an act granting certain rights to riparian owners of land within the State, and that under and by virtue of said act they, as riparian owners, are the legal owners of all land at the Westerly end of Green street from high water mark to the inshore edge of the channel, under the waters of the harbor of Key West.

The defendants, in their answer, allege, that other citizens of Key West, who have not complained of the said wharf and railway, own a large majority of the land on both sides of Green street; that defendants themselves own much more land fronting on said street than complainants. They also allege, that the grant did secure a guarantee, and an adequate one, as to the return of said wharf; that, although Green street is only fifty feet wide, they allege that they can construct a permanent and useful wharf without encroaching upon or invading the rights of complainants, or of any one else. They deny that any authority other than the State can convey a right to the soil covered by tide waters. They deny that the grant to them diverted the use of said street from the public to private purposes, or that the contemplated wharf and railway, or either of them, would operate as an injustice or hardship to the legal or equitable rights of any person, or that they would prove an obstruction to Green street. They assert that the building of the wharf is necessary, and, so far from trespassing on the rights and privileges of complainants, would enhance the value of all the lots on said street, and, instead of abridging, would enlarge the public use and benefit. They insist that the original grant was absolute and irrevocable by a subsequent City Council.

W. H. Von Pfister, George W. Watson, Benjamin Sawyer, R. L. Hicks, William Hemp, witnesses examined on the part of defendants, all testified, that, in their opinion, the building of the wharf and railway would increase the value of the property on Green street.

It also appears from the testimony, that a grant to the United States to build two similar railways had been made by the City Council.

The Court below, after the final hearing of the case, de_

creed the injunction which had been granted on the filing of the bill of complaint to be made perpetual, but further ordered that the defendants were not to be thereby barred of any action for damages they may have sustained by the suing out of the said injunction.

From this decree the complainants, as well as the defendants, appealed.

*O. B. Hart* for Geiger and others.

*Archer & Papy* for Filor and others.

BALTZELL, C. J., delivered the opinion of the Court.

Railroads in cities or towns cannot with propriety be termed nuisances. They are decided not to be such in numerous cases, both by English and American Courts. They are in use in the principal cities of Europe and this country, and, when regulated by proper restrictions, are valuable aids to commerce. Nor could it well be otherwise. A road of this kind presents but a smoother surface for a wagon or carriage than that which prevails in the adjacent part of a street, thus giving facility instead of raising obstruction to the movement of produce or the transfer of passengers. Nor are wharves necessarily nuisances, as the definition of the word shows: "A sort of quay, constructed of wood or stone, on the margin of a road-stead or harbor, along side of which ships or lighters are brought for the sake of being conveniently loaded or unloaded." Where the water is shallow near the shore, neither passengers nor goods, without their aid, could be conveyed to or from the land or sea without great trouble, inconvenience, delay and expense. They are indispensable to commerce, and no city or town in the present advanced state of commerce, having navigable facilities, could be without them. What would be the position and situation of Key West, an

island in the great ocean, without her admirable and convenient wharves, giving free ingress and egress to her citizens and strangers from all parts of the world and affording almost unequalled facilities for loading and unloading vessels of the greatest burthen? It is true that these, like all other blessings, may be converted into injuries or subjects of offence. So wharves may be made or may become nuisances. They may extend too far into a narrow channel, so as to obstruct the free passage of vessels, or may become decayed or be the means of collecting filth. The first of these, it is presumed, could not arise at Key West, the bay or broad open sea being the channel, and, as no wharf has been constructed as yet, the other objections cannot apply.

It is, perhaps, sufficient to say, in reference to this question of nuisance, that the Court below intimated a design and offered to direct an issue of fact to ascertain whether the construction of the proposed wharf and railroad would be injurious to plaintiffs. This much is apparent by the record. Five witnesses on the part of defendant speak of the effect of their construction as calculated to "increase the value of complainants' lots and property," " as of benefit to all," "as having a good effect," as of no " damage to property in the street," as no disadvantage to it, "as of no detriment," " as beneficial and advantageous." These are the opinions of witnesses on inspecting the plan of the proposed structures, and not a witness proves to the contrary. It appears, too, that the General Government have a wharf and railroad track passing through Green and other strees of the city, by permission of the City Council, and without opposition from any one. The allegation, then, as to the injurious character of these structures must be regarded as disproved, if not abandoned, by this rejection of the offer to try the issue. Complainants themselves

would seem to have apprehension of their case in this re-
spect, as they obtained leave and filed a supplemental bill
asserting another and distinct ground of relief: "That one
Simonton, the original owner of the soil on which the
town was laid out, established lots, squares and streets,
and sold said lots with reference to said streets, whereby
the streets were *dedicated* to the public use, but that said
*Simonton* did *not convey any* title whatever in said street;
that the title in and to the lands used as streets remained
in said *proprietor*, who conveyed, for a valuable con-
sideration, the fee simple of, in and to the said streets of
the said city to complainants; that this pretended grant
by the City Council to defendants, by diverting the street
from *public use*, to which it had been *dedicated* by the
aforesaid Simonton, and granting it to a private use, was
in effect a *surrender of the franchise and use of the said
street* to the original proprietors, who had never parted
with the fee thereof, in fraud of the rights of the corpora-
tors, and that a new City Council did annul and cancel
the grant to the said corporators, after full investigation
thereof, with notice before they had proceeded under the
said grant; that they (complainants) are the true, legal
and *bona fide* owners of the fee simple of all the lands in
the city of Key West, in Green street and its other streets,
which lie between low water mark and a line drawn 12
feet above high water mark, and are entitled to have, exer-
cise and enjoy all the rights, privileges and immunities
thereunto belonging as fully as ever the original proprie-
tor of the said city. Further, that the State being the true
and lawful owner of the line of land between high and low
water marks, and, consequently, of the position claimed
as a wharf, in December of the year 1856, passed a law
surrendering to the proprietors, and that complainants are
now owners by title duly derived from them."

Geiger et al. vs. Filor et al.—Opinion of Court.

If the proof had not been so clear that there was not a nuisance—if indeed there was one as complained of—it would not produce a forfeiture of the franchise. This is fully established by the authorities. An abuse of the power of the City Council could easily be prevented by the Courts, without devolving upon the city or its inhabitants such injury and loss to the public as would ensue from closing an entire street so as to make it private property. The remedy for obstructing a street is by indictment, injunction, action on the case, &c.—Angel on High., 222.

Dismissing this view of the subject, we proceed to the case made out by the supplemental bill, setting up a right in the land in front of the end of the street, covered by water, through and under the act of the Legislature. To understand this fully, it will be necessary to arrive at the state of the law existing previous to and at the time of its passage. By the civil law in force in Spain and the colonies, whence the right of the proprietors of the town was derived, "the use of the shore (that is, of the land) that is usually overflowed by the highest tide, by the law of nations, is public in the same manner as the sea."—Angel on Tide-waters, 18, 68. "Any person was at liberty to place a cabin there to harbor himself, and, for a like reason, to dry nets and drag them from the sea."—*Ibid.*, 19.

"The claim of the citizens and inhabitants of a State or country to the free use of the waters of the sea and their shores for private advantage, is so obviously dictated by the law of nature, that in the first ages of all countries, they have been left open to public use. It is either so directed by the positive codes of law or so made obligatory by the acknowledged customary or common law of every enlightened nation. Thus, under the jurisprudence of Jus-

tinian, these were held natural rights and common to all: the air, running water and the sea, and hence the shores of the sea. Nobody is therefore prohibited to come to the sea-shores, and all rivers and ports are public, so that the right of fishing in a port is common to all."—Angel, 18.

The common law of England is said by this writer to be at variance with the civil law in this, that they make such waters "the property of no one." The policy of the common law is to assign to every thing capable of occupancy and susceptible of ownership a legal and certain protection, and accordingly makes these things, which, from their nature cannot be exclusively occupied and enjoyed, the property of the sovereign. The King, in England, is regarded as the universal occupant, and the presumption is that all property was originally in the crown. The right of property in the tide-waters of England is, moreover, vested with the King, not merely on the principle that he is the universal occupant, but on the principle that he is the fountain from whence, in contemplation of law, all authority and privileges proceed.—Angel, 19, 20.

To the King of England is, therefore, not only assigned the sovereign dominion of the sea adjoining the coasts and over the arms of the sea, but in him is also vested the right of property in the *soil thereof.*—Angel, 20.

"The King holds this, not as his own private property, but for the public and as trustee to preserve and maintain it for the use of his Majesty's vessels and others, to secure to his subjects the free and uninterrupted use of these in-herent privileges of navigation. They are of common right, public, as by the civil law, for every subject to navigate upon and to fish in without interruption. And although the right of property in the soil covered and flowed by these waters is in the King to high water mark, yet the shore on the land between high and low water mark is also

of common right public. The King has the property, but the people have the use necessary. The free and uninterrupted enjoyment of these is deemed an inherent privilege. The rights thus denominated are of navigation and fishery, and classed among those public rights known as *jura publica* or *jura communia*, as contradistinguished from *jura coronœ*, the private rights of the crown."— Angel, 23.

The subject is still further illustrated in the work quoted, under the head of *purprestures*, &c.:

" By the civil law, to repair and strengthen the banks of public rivers is permitted as being most useful, provided it does not impede navigation. Against one who projects a wall into the sea, the indictment lies by one who is thereby injured; but, if no one sustains injury, he who builds on the sea-shore or projects a wall is protected." Angel on Tide-waters, 198.

" Nor by the law of England is such action positively prohibited. Such encroachment may or not be a public nuisance. It is not every building below the high water mark, nor every building below the low water mark, that is *ipso facto* in law a nuisance; for that would destroy all the keys in all the ports of England; for they are all built below the high water mark, for otherwise vessels could not come to them to unlade. In case, therefore, of building within the extent of a port, in or near the water, whether it it be a nuisance or not is a *questio facti* and to be determined by a jury upon the evidence, not *questio juris.*"—Hale de jure Maris; Hargrove's Tracts, 85; Angel on Tide-waters, 200.

" Although not a nuisance, it may be yet a *purpresture ;* in which event the Court may direct an enquiry to be made, whether it is more beneficial to the crown to abate the *purpresture* or to suffer the erection to remain and be

erected; and this is by information of *intrusion* at common law, or by information at the suit of the Attorney General in equity."—Angel, 201.

On the change of government which took place by the treaty of Spain transfering Florida to the United States, and afterwards on the assumption by the people of a State government, the right to the shores of navigable waters and the soils under them enured, first to the General Government and then to the State, according to the decision made by the Supreme Court of the United States in various cases before them.—See cases of 3d Howard, 219 ; 5 Howard, 477.

In the case of the city of New Orleans vs. the United States, which involved the question of the right of property in a quay in front of the city, claimed by the city through a dedication thereof by France and Spain, it is said : "If the common in contest, under the Spanish crown, formed a part of the public domain or the crown lands, and the King had power to alienate it as other lands, there can be no doubt that it passed under the treaty to the United States, and they have the right to dispose of it the same as other lands. But if the King of Spain held the land in trust for the use of the city, or only possessed a limited jurisdiction of it principally, if not exclusively, for police purposes, was this right passed to the United States under the treaty ?" The question is answered by saying, " that, in their opinion, neither the *fee* of the land in controversy, nor the *right to regulate its use*, is vested in the United States."—10 Peters, 787.

We have seen by the authorities quoted, that this land, as well by the laws of Spain as by the English law, belonged to no one, or rather, to the public at large, and that the crown of neither country could alienate it.

The question is not raised here as to the power of the

State to alienate, but whether the State has actually transferred to complainants or to the proprietor from whom they derive title. The law is entitled "an act to benefit commerce," and recites:

"Whereas, It is for the benefit of commerce that wharves be built and warehouses erected to facilitate the landing and storage of goods; And, whereas, The State being the proprietor of all submerged lands and water privileges within its boundaries, which prevents the riparian owners from improving *their water lots*—Therefore,

"*Be it enacted*, That the State, of Florida, for the considerations above mentioned, divest themselves of all right, title and interest to all lands covered by water lying in front of any tract of land owned by a citizen of the United States, or by the United States for public purposes, lying upon any navigable stream or bay of the sea or harbor, as far as to the edge of the channel, and hereby vest the full title to the same in and unto the riparian proprietors, giving them the full right and privilege to build wharves into streams or waters of the bay or harbor as far as may be necessary to effect the purposes described, and to fill up from the shore-bank or beach as far as may be desired, not obstructing the channel, but leaving full space for the requirements of commerce; upon lands so filled in to erect warehouses or other buildings, and also the right to prevent encroachments of any other upon all submerged lands by bill in chancery, &c.; also confirming to the riparian proprietors all improvements which may heretofore have been made upon submerged lands for the purposes within mentioned; that nothing in this act contained shall be so construed as to release the title of the State of Florida, or any of its grantees, to swamp or overflowed lands within the limits of the same, but the grant herein contained shall be limited to those persons and bodies cor-

porate *owning lands actually bounded by* and extending to low water mark on such navigable streams, bays or harbors."—Laws 1856, page 25.

The avowed object of the law is to give to the owners of land, being riparian proprietors, in front of a navigable stream, arm of the sea, bay or harbor, the right and interest of the State in and to the land covered by water as far as the edge of the channel, and to owners who were prevented by the State's title from improving lots so situate between them and the water. If complainants are such owners in contemplation of this law, then their case is made out. Are they such owners? They assert a dedication of the street by the original proprietors in laying out the town and making sale of the lots, and that no conveyance was made, and that the street has been subjected to a private use so as to forfeit the right to it.

The latter point we have already disposed of, and, as to the former, it is too well settled by authorities to admit of further question that a dedication without conveyance may be as good as with it. This dedication was made in 1829, and there is no evidence of a disturbance of the possession during a period of near thirty years, so that there can be no doubt of the right of the city to the street leading to the water.—See cases of 6 Peters, 433 and 507; 10 Peters, 713; 9 Howard S. C., 10.

Yet there is an interest remaining in the proprietor of a town, or his vendees, which it may be material to enquire into still further to elucidate the subject. The owner of the land over which the highway passes retains the fee and all rights of property not incompatible with the public easement, and whenever the highway is abandoned or lost, it becomes his original unincumbered dominion.—Angel on High., 301.

The learned author, in continuation of the subject, makes these remarks :

"The rights which the ownership of the fee, where it exists, gives are subject in practice to endless modifications depending upon the exigencies of the public and the location of the highway. The more ancient decisions limited the rights of the public to that of passage and repassage and treated any interference with the soil other than was necessary to the enjoyment of this right as a trespass. But the modern decisions have very much extended the right, and, particularly in the streets of populous cities, have reduced the interest of the owner of the soil to a mere naked fee of *only a nominal value.*"—*Ibid.*, 312.

The distinction is not properly taken in these authorities, we think, between the right of the original proprietor and his vendees in the property of a street. It has not been urged here and we therefore do not think proper to decide it. It is by no means clear that this proprietor, or the vendees of this particular interest, own this right in opposition to the purchasers and owners of lots in the city. The right of the owner, as indicated by this author, is not inconsistent with the use of the land as a street. Thus, as owner, he has the right to all the trees and mines under it, (§ 302)—to dig the soil and use the timber, &c.—the right to maintain trespass against one coming on the sidewalk and using abusive language, (§ 305)—the right to the herbage on the highway, (§ 306.) Now the right of the city, in comparison with this, is far more extensive, being that of occupancy and use for travel and transportation by the public of every various kind, all hours of the day or night, together with the duty to keep it in order and prevent obstruction to its free use, possession and enjoyment. The right of the one is instant, present, potent in all time to come, that of the other distant, uncertain, qualified, con-

tingent—so that, if it depended upon the ownership contemplated by the law, we should not hesitate to give such construction of the meaning and intention of the Legislature as to give to the city as the owner rather than to complainants. Indeed, the grant might be construed to give to each to the extent of his interest—the present right to the city, the future to complainants when the right and possession of the city is abandoned.

There are other views, of no slight interest, in connection with the subject. We have already seen that the city has been in the possession and enjoyment long enough to create a right. Be this as it may, the State does not undertake to interrupt or disturb the right of any one. It merely divests itself of its right or title, leaving the possessor undisturbed and by no means desiring to interfere with or take from a right or interest of property existing in another, more especially when such right, as in this case, of great public advantage and benefit, might force this party to a purchase of the property to answer the public exigencies, or to subject the property to uses of great, perhaps indispensable, moment and importance. To assert the contrary conclusion would be to turn an act of high beneficence on the part of the State into one of merited reproach. It would be to assert that the Legislature had trifled with the great interests of the public in one of her cities, as such grant would put it in the power of individuals to destroy the street, to defeat its main objects and purposes—to deprive the law of its principal beneficial design and character. It would be as if a power was given in one of our towns on land to block up the approach from a street to the surrounding country.

It is not difficult to see that complainants are not embraced by either the terms or the spirit of the law. There are no water lots at the ends of the streets held by them,

and they are not the riparian proprietors prevented from improving any lots there claimed by them. On a full consideration of the subject, we are of opinion that neither the complainants nor the original proprietor of the lots derived title to the land between high and low water mark at the end of the streets, from this law, and that their claim on this ground is unsustainable. Whilst such are our views on this subject, it is incumbent upon us to show how far they are supported by authorities bearing on the subject.

It has been held, says the author above quoted, that " where an act of the Legislature of New York authorized a proprietor of lands lying on East river, upon which the city of New York is bounded, which is an arm of the sea, to construct wharves and build bulk-heads in the river in front of his land, and there was at the time a public highway through said land terminating at the river, such proprietor could not, by filling up the land between the shore and the bulk-head, obstruct the public right of passage from the land to the water, but that the street, by operation of law, was extended from the former terminus to the newly made land to the water. The design of the act was to confer privileges on the owners of land adjoining the East river, but not to destroy the rights of the public to reach its waters through Warren or any other street which then led to its shore. Nor should the act be so construed as to make a public mischief, unless required by words of the most implicit and unequivocal import."—Angel on High., § 26; People vs. Laundrum, 5th Denio, 9.

In the plan of the town, made part of the record, which plaintiffs exhibited, the streets extend to the water and are left open there. The effect of such dedication is given in numerous cases well worthy of consideration. The case of

12

Blakely, &c., vs. Hemley, lessee, decided by the Supreme Court of the United States, is important as to several points involved in this case. This was a suit to recover a lot of land in the city of Pittsburg lying between Water street and the Monongahela river. The Court say, "from the plan of the town, it does not appear that any artificial boundary, as the Eastern limit of Water street, was laid down; the name of the street was given and its Northern boundary, but the space to the South is left open to the river. All the Streets leading South terminate at Water street, and no indication is given on the plat or in the return of the Surveyor that Water street did not extend to the river. Whether Water street extended to high or low water mark can be of no importance in the present controversy. If its Southern boundary be limited by high water mark, it is clear that the proprietors parted with all their right. It is admitted by both parties that the river Monongahela, being a navigable stream, belongs to the public, and a free use of it may be rightfully claimed by the public whatever may be the extent of its volume of water. If Water street be bounded by the river on the South, it is only limited by the public right. To contend that between this boundary and the public right a private and hostile right could exist, would not only be unreasonable but contrary to law. If the jury shall find that the ground in question was dedicated to the public as a street or highway, or for other public purposes, to the river, either at high or low water mark, the right of the city will be established."

The Court below having instructed the jury that the acts of ownership (that of having wharves and a graduated pavement,) for which a tax was imposed on steamboats, were inconsistent with the rights asserted in behalf of the public, and that it could not be legally treated and used as private property, the Court say : "If this ground had

been dedicated for a particular purpose and the city authorities had appropriated it to an entirely different purpose, it might afford ground for the interference of a Court of Chancery to compel a specific execution of the trust by restraining the corporation or causing the removal of obstructions; but, even in such case, the property would not revert to the original owner limited only by conditions imposed in the grant. It does not appear, however, that the construction of wharves on the river¸ and the pavement on the ground have in the least degree obstructed its use as a street. The wharves cause no obstruction to the use of the ground as a street, and whether the authorities have transcended their power by raising a revenue from them, is a question not necessarily involved in the case."—6 Peters, 510.

It will be thus seen that this decision, maturely considered by the Court, covers nearly the entire ground of the present controversy. Other cases on the main point in the case have been determined by other Courts, to which a short reference will be given, re-affirming the doctrine thus laid down. Thus, in Rowan's executors vs. the Town of Portland, the Court say: "There is no line on the map of the town dividing or separating the town from the river; and, if there were, it should rather be presumed that the shore between such line and the river was thus discriminated for the purpose of showing that it was intended for some use of the town differing from ordinary streets and public grounds, and that the cross streets, at least, were intended to extend to the river at some future day, than that a town located upon the bank of such river and at a point selected for its commercial advantages should be wholly shut out from free and common access to the river. The unreasonableness of this latter presumption has been more than once declared by this Court, and

346　　　　　SUPREME COURT.

Geiger et al. vs. Filor et al.—Opinion of Court.

the fact that a town is laid off upon the bank of a navigable river, is held to be sufficient evidence of its extending to the water, unless a contrary intention is manifestly indicated."—8 B. Mon., 240.

The same doctrine is held in 2 J. J. M., 224, 7 B. Monroe, 680. In the former case, the Court say: "The front street runs parallel with and near to the river. There were no lots between it and the river, but some vacant ground from this street to the margin of the river. This land belongs to the trustees, never having been sold or appropriated by them;" and, from subsequent parts of the opinion, it is evident they were considered as holding it for the benefit of the town and might obtain the grant of a ferry, of which the town should receive the profits.—8 B. M., 241.

In the city of Louisville vs. Bank of the United States, the Court say: "It would be almost as reasonable to sell and appropriate as private property the river itself as the ground lining its margin, the occupation of which would obstruct the connection between the lots and the river. The object of locating the town on the river was to enjoy the benefit of its facilities as a highway." A similar inference of the intention to secure at all times and under all circumstances a free access to the river and an unobstructed right to the common use of its banks is stated in Kennedy's hs. vs. Covington, 8 Dana, 61; 8 B. Mon., 242.

In Godfrey vs. the City of Alton, the Supreme Court of Illinois held, that "when an easement is granted to the public upon the margin of a navigable stream, the right to use and treat it as a landing is undoubted. Having dedicated the banks of the river, this united the two easements each of which was essential to the full enjoyment of the other. The proprietors had no interest in the bed of the stream which they could reserve to the prejudice of

the enjoyment of the public easement over it."—12 Illinois, 36.

A case of the brig Empire State, decided by a Judge of the District Court of the United States in Michigan, has been mainly relied upon by complainants. This asserts, that "the public streets remain as originally dedicated and no right of possession is given, and there is no transfer of the fee in them, and consequently the city cannot occupy them except for purposes of regulation either for public business or public use, or give authority to others to do so. The character of the use cannot vary the terms of the grant or convey that which was expressly withheld. Unquestionably, the city may erect at their *termini of the streets, in the river, suitable wharves or landings*, but by so doing such erections become free to the public as extensions of the streets, and the city has no authority, and can confer none, to exact tolls for egress and regress."—1 Newbury, 550.

We are not acquainted with the reputation of the Judge who pronounced the opinion, so as to be satisfied with his decision and regard it as authority, nor is the case so treated as to entitle it to this estimation. Judges of the District Court of the United States occupy the position and station of Circuit Court Judges of the State, and have jurisdiction in some respects more extensive, in others more limited, and their decisions are entitled to about the like regard, dependent always upon the reasoning and strength with which they are supported.

For reasons already expressed, we do not assent to the view as to the effect of a want of a conveyance of the streets upon the rights of a city. The power and right of a city to erect a wharf being conceded, it seems to us that the imposition of a toll would and should depend upon a right discretion in the City Council. If they construct

wharves, it will be at the expense of the inhabitants, by tax, and no objection is perceived to an arrangement by which the public burthens in this respect may be relieved and prevented. They may, if they think it preferable, contract with individuals to erect wharves, and from the use of them in obtaining toll prevent the expense of erection to themselves and thus greatly remunerate for any outlay in their construction. It is a franchise, and should be so regarded, just as a city or town may build a market to be free to all, or with the imposition of a tax upon the vendors of articles of sale to compensate for its erection, attention, &c. We do not perceive anywhere in the examination we have made, and we have made every exertion to examine all the cases in our reach, that such rights or privileges have in any instance been denied to city authorities. The principal cities in this country and in England seem to possess and enjoy the privilege, and it would not comport with the fair and rightful exercise of these rights for municipal bodies to be debarred of their use and enjoyment. The land at the end of a street in a city, located on a water course or arm of the sea, is either shallow or has deep water near the shore. In the former case, it can be used alone by lighters and very small vessels, but even these require regulation and attention proportioned to the extent of the trade of the place. This very regulation creates expense, and what should prevent a tax or toll from those receiving the benefit of the land and of the provision for its regulation? But why should this easement be confined to small vessels and lighters—restricted to the few, when it may, by an additional expense, be made to benefit the many? Why not, by the construction of wharves, give an access to all vessels, large as well as small, thus affording facilities for the landing of passengers and to the ready transportation of

goods? If the easement exists at all, it is and should be with all the improvements that science and skill and modern art can bring to its aid.

*Quo warranto* was brought against the corporation of Boston, in England, for demanding toll thorough. They justified the demand by reason of a consideration for repairing a bridge and pavement, and also a sea beach, and the Court held upon this, that although *toll thorough* could not be claimed as such without more, yet, as here, it was founded upon a consideration, it should be deemed good. See Williamson vs. Jones, 162; Ray vs. Corporation of Boston, Cro. Eliz., 711.

It is upon such principles that toll is exacted for passing highways, bridges, ferries, &c., which are public, and that is called toll thorough.—Woolrich's Law of Waters, page 303.

This decision is independent of any statutory right. Upon common law principles, the charter of the city would but confirm the right. In the present case, a contract was made by the city with defendants to construct a wharf and a railroad track, giving them the emoluments arising from wharfage, &c., for ten years, with the requirement to return the wharf at the end of that time in good condition to the city. The allegation is, that this was made without adequate consideration. There is no proof to support it, and the answer denies that the consideration was insufficient. *Prima facie* the City Council is the best judge of its own interests, and without proof of improper or injurious action on their part, there is no pretext for calling it in question by this Court. We cannot presume that they have acted improperly or have parted with an important interest, without any value.

Again, it is alleged that the City Council made the contract without notice to the citizens and against the appro-

bation of the citizens. We are not aware that notice is required by law to be given of contracts made by the city, or that the assent of the citizens is required to be given to their contracts or other action. No such showing has been made to us.

It is said, again, that a City Council, subsequently elected and convened, have, by solemn act and resolution of their Board, annulled, canceled and set aside the said agreement and contract made with defendants, by which they were to have the privilege of constructing a wharf and railroad. It would be a curious lease, agreement or contract that one of the parties, without any provision in it giving such right, could annul, cancel and set aside. It was not a mere license, but a contract, executed by both parties and entitled to all the regard of such.

On the whole case, after mature deliberation and reflection, we are of opinion that the decree of the Circuit Court in favor of complainants, making the injuction perpetual, is erroneous and should be set aside with costs, and the case remanded, with directions to that Court to dismiss the bill with costs.