492 So.2d 339 (1986)
COASTAL PETROLEUM COMPANY, Petitioner,
v.
AMERICAN CYANAMID COMPANY, et al., Respondents.
BOARD OF TRUSTEES OF the INTERNAL IMPROVEMENT TRUST FUND of the State of Florida, Petitioner,
v.
AMERICAN CYANAMID COMPANY, et al., Respondents.
BOARD OF TRUSTEES OF the INTERNAL IMPROVEMENT TRUST FUND of the State of Florida, Petitioner,
v.
MOBIL OIL CORPORATION, Respondent.
Nos. 65696, 65755 and 65913.
Supreme Court of Florida.
May 15, 1986.
Rehearing Denied May 30, 1986.
*340 Robert J. Angerer, Tallahassee, C. Dean Reasoner of Reasoner, David and Fox, Washington, D.C., and Joseph C. Jacobs of Ervin, Varn, Jacobs, Odom and Kitchen, Tallahassee, for petitioner, Coastal Petroleum Co.
Julian Clarkson of Holland and Knight, Tallahassee, for respondents, American Cyanamid Co., Estech, Inc. and Mobil Oil Corp. in No. 65696.
Jim Smith, Atty. Gen., Tallahassee, Robert J. Beckham of Beckham, McAliley and Schulz, Jacksonville, and Roberts, Miller, *341 Baggett, LaFace, Richard & Wiser, Tallahassee, James R. Hubbard of the Law Offices of James R. Hubbard, and William C. Crenshaw of Valdes-Fauli, Cobb and Petrey, Miami, for petitioner, The Board of Trustees of the Internal Improvement Trust Fund of the State of Florida.
Chesterfield Smith, Julian Clarkson and Hume F. Coleman of Holland and Knight, Tallahassee, for respondents, American Cyanamid Company, and Estech, Inc. in No. 65755 and for respondent Mobil Oil Corp. in No. 65913.
Robert J. Angerer, Tallahassee, C. Dean Reasoner of Reasoner, Davis and Fox, Washington, D.C., and Joseph C. Jacobs of Ervin, Varn, Jacobs, Odom and Kitchen, Tallahassee, for amicus curiae, Coastal Petroleum Co.
Joseph W. Little, and Richard G. Hamann, Gainesville, for amicus curiae, The Florida Defenders Of The Environment.
SHAW, Justice.
These consolidated cases are before us on petitions to review decisions of the Second District Court of Appeal reported as Coastal Petroleum Co. v. American Cyanamid Co., 454 So.2d 6 (Fla. 2d DCA 1984), and Board of Trustees of the Internal Improvement Trust Fund v. Mobil Oil Corp., 455 So.2d 412 (Fla. 2d DCA 1984), in which the following questions were certified as being of great public importance:
I. Do the 1883 swamp and overflowed lands deeds issued by the trustees include sovereignty lands below the ordinary high-water mark of navigable rivers?
II. Does the doctrine of legal estoppel or estoppel by deed apply to 1883 swamp and overflowed deeds barring the trustees' assertion of title to sovereignty lands?
III. Does the marketable record title act, chapter 712, Florida Statutes, operate to divest the trustees of title to sovereignty lands below the ordinary high-water mark of navigable rivers?
American Cyanamid Co., 454 So.2d 6, 9-10. We have jurisdiction pursuant to article V, section 3(b)(4), Florida Constitution, and answer all three questions in the negative.
In 1982 and 1983, respondents filed separate quiet title actions in Polk County Circuit Court against petitioners claiming fee simple title to portions of the beds of the Peace and Alafia rivers. In each case, petitioners moved to dismiss the suits to quiet title based on Mabie v. Garden Street Management Corp., 397 So.2d 920 (Fla. 1981). The trial court denied the motions. Respondents then moved for summary judgments in their respective cases. The trial court granted said motions.
The Second District Court of Appeal affirmed the summary judgments in separate opinions filed on July 13, 1984. 454 So.2d 6; 455 So.2d 412. In American Cyanamid, the district court held that under section 197.228(2), Florida Statutes (1981), this state's unconditional conveyance of land to private individuals without reservation of public rights contemplated a finding that the land is not sovereignty land; that the Trustees were barred from asserting a sovereignty title claim by the doctrine of legal estoppel; and, that Florida's Marketable Record Title Act barred any otherwise valid sovereignty title claim. 454 So.2d at 8, 9. Recognizing, however, the significant impact of its decision on the riverbeds at issue, the district court certified to this Court the aforementioned three questions as being of great public importance. Id.
In Mobil Oil, the district court held that the Polk County Circuit Court did not err in denying petitioner Trustees' motion in the alternative because the Leon County Circuit Court lacked jurisdiction over the subject matter of respondent Mobil's reply counterclaim for the reason that the counterclaim is in rem in nature and local to Polk County Circuit Court. 455 So.2d at 416. The district court further noted that the substantive issues raised by petitioner Trustees were decided adversely to the Trustees in American Cyanamid. Id. By order of September 4, 1984, the district court certified to this Court the same three *342 questions certified in American Cyanamid.
The first certified question is premised on the uncontroverted legal proposition that Florida received title to all lands beneath navigable waters, up to the ordinary high water mark, as an incident of sovereignty, when it became a state in 1845. No patents or surveys were required to delineate the boundaries of such sovereignty lands and title vested in the state to be held as a public trust. Thereafter, the federal government did not hold title to such sovereignty lands and had no power to convey them to either the state or other parties. Moreover, any surveys run by the federal government establishing meander lines were not conclusive against the state as the boundary lines between state sovereignty lands and federal uplands. Borax Consolidated Ltd. v. City of Los Angeles, 296 U.S. 10, 56 S.Ct. 23, 80 L.Ed. 9 (1935); Martin v. Busch, 93 Fla. 535, 112 So. 274 (1927).[1]
In contrast to state sovereignty lands, the title to non-navigable swamp and overflowed lands, and other federal uplands, continued to reside in the federal government after 1845. However, in the 1850s, Congress exercised its power by conveying swamp and overflow uplands to the state. Surveys were conducted and patents issued whereby Florida received approximately twenty million acres of such lands. It is important to recognize that Congress had no intent or power to convey state sovereignty lands through such acts or patents and that land surveys conducted in connection with these conveyances of swamp and overflowed lands are not conclusive against the state as to the meandered boundaries of state sovereignty lands. See Borax Consolidated, Ltd., 296 U.S. at 16, 56 S.Ct. at 26, citing to and relying on Donnelly v. United States, 228 U.S. 243, 33 S.Ct. 449, 57 L.Ed. 820 (1913); Mobile Transportation Co. v. City of Mobile, 187 U.S. 479, 23 S.Ct. 170, 47 L.Ed. 266 (1903); Shively v. Bowlby, 152 U.S. 1, 14 S.Ct. 548, 38 L.Ed. 331 (1894); Goodtitle ex dem. Pollard v. Kibbe, 50 U.S. (9 How.) 471, 13 L.Ed. 220 (1850); and Pollard v. Hagan, 44 U.S. (3 How.) 212, 11 L.Ed. 565 (1845). The title to swamp and overflowed lands which Florida received in the 1850s and thereafter was vested in the Board of Trustees for the Internal Improvement Fund of Florida by the legislature. The title to sovereignty lands at this point remained in the legislature as a public trust. Illinois Central Railroad v. Illinois, 146 U.S. 387, 13 S.Ct. 110, 36 L.Ed. 1018 (1892); Broward v. Mabry, 58 Fla. 298, 50 So. 826 (1909); State v. Black River Phosphate Co., 32 Fla. 82, 13 So. 640 (1893). These lands differ from other state lands. Sovereignty lands are for public use, "not for the purpose of sale or conversion into other values, or reduction into several or individual ownership." State v. Gerbing, 56 Fla. 603, 608, 47 So. 353, 355 (1908). Even after title to sovereignty lands was subsequently assigned to the Trustees, their authority to dispose of the land was rigidly circumscribed by court decisions and was separate and distinct from their authority to dispose of swamp and overflowed lands.[2] We answered the first certified question in the *343 negative when we held in Martin, 93 Fla. at 573, 112 So. at 286-87 that:
The State Trustee defendants cannot, by allegation, averment or admission in pleadings or otherwise affect the legal status of or the State's title to sovereignty, swamp and overflowed or other lands held by the Trustees under different statutes for distinct and definite State purposes... . The subsequent vesting of title to sovereignty lands in the Trustees for State purposes under the Acts of 1919 or other statutes does not make the title to sovereignty land inure to claimants under a previous conveyance of swamp and overflowed lands by the State Trustees who then had no authority to convey such sovereignty lands and did not attempt or intend to convey sovereignty lands.
Further,
[i]f by mistake or otherwise sales or conveyances are made by the Trustees of the Internal Improvement Fund of sovereignty lands, such as lands under navigable waters in the State or tide lands, or if such Trustees make sales and conveyances of State School lands, as and for swamp and overflowed lands, under the authority given such Trustees to convey swamp and overflowed lands, such sales and conveyances are ineffectual for lack of authority from the state.
Id. at 569, 112 So. at 285 (citations omitted).
The court below relied in part on the provisions of section 197.228(2), Florida Statutes (1981), which provides:
(2) Navigable waters in this state shall not be held to extend to any permanent or transient waters in the form of so-called lakes, ponds, swamps or overflowed lands, lying over and upon areas which have heretofore been conveyed to private individuals by the United States or by the state without reservation of public rights in and to said waters.
We do not agree that this section is pertinent to the issues at hand. We are dealing with navigable rivers not "so-called lakes, ponds, swamps, or overflowed lands." We are not persuaded that the legislature intended by this statute to divest the state of title to navigable waters which were not, or could not be, conveyed to private owners. To accept this position would mean, inter alia, that if a navigable river gradually and imperceptively changed its course onto previously conveyed lands, the navigable river would become private property and the public would retain the dry river bed. The high and low water marks of navigable waters change over time, but these natural changes do not divest the public of ownership of the navigable waters. Bonelli Cattle Co. v. Arizona, 414 U.S. 313, 94 S.Ct. 517, 38 L.Ed.2d 526 (1973); Municipal Liquidators, Inc. v. Tench, 153 So.2d 728 (Fla. 2d DCA), cert. denied, 157 So.2d 817 (Fla. 1963).
The second certified question pertains to the effect of the Trustees' later acquisition of legal title to sovereignty lands encompassed within previously conveyed swamp and overflowed lands. This question was also addressed and answered in Martin, as the quotations above show. Not only is there no legal estoppel to the Trustees' claim of ownership in sovereignty lands, but the Trustees are prohibited by case law from surrendering state title to sovereignty lands based on a prior conveyance of swamp and overflowed lands. Sovereignty lands cannot be conveyed without clear intent and authority, and conveyances, where authorized and intended, must retain public use of the waters. Martin, Mabry. The fact that a deed of swamp and overflowed lands does not explicitly exempt sovereignty lands from the conveyance does not show that the Trustees intended to convey sovereignty lands encompassed within the swamp and overflowed lands being conveyed. Further, because grantees of swamp and overflowed lands took with notice that such grants did not convey sovereignty lands, neither they nor their successors have any moral or legal claim to these lands. Martin, 93 Fla. at 569-73, 112 So. at 285-87.
The final certified question is whether the Marketable Record Title Act (MRTA), chapter 712, Florida Statutes, operates *344 to divest the state of title to sovereignty lands. Respondents and the courts below rely on Odom v. Deltona Corp., 341 So.2d 977 (Fla. 1976), for the proposition that the state's title to navigable water beds previously conveyed as swamp and overflowed lands is extinguished by MRTA. This reliance is misplaced. In Odom we rejected the state's argument that the notice of navigability concept applied to the grantees of swamp and overflowed lands under certain trustees' deeds because "it seems absurd to apply this test to small, non-meandered lakes and ponds of less than 140 acres and, in many cases, less than 50 acres in surface." Id. at 988. The ground on which Odom rests is this factual determination that the small lakes and ponds at issue were non-navigable, non-sovereignty lands. Unfortunately, even though this factual determination controlled and resolved the case, we went on to answer irrelevant arguments put to us by the parties and in answering one such argument concluded that MRTA was applicable to sovereignty lands encompassed within conveyances of swamp and overflowed lands and that the claims of trustees "to beds underlying navigable waters previously conveyed are extinguished by the Act." Id. at 989. The statements concerning the effect of MRTA on navigable waterbeds were dicta and are non-binding in the instant case inasmuch as there were no navigable waterbeds at issue in Odom. See Askew v. Sonson, 409 So.2d 7 (Fla. 1981), where we requested and received briefs on the effect of MRTA on sovereignty lands. On reflection, and citing Odom, we declined to rule "on the question of whether a private owner's title to what had been sovereignty lands could be perfected by MRTA prior to the effective date of the 1978 amendment." Id. at 9. See also City of Miami v. St. Joe Paper Co., 364 So.2d 439, 445, 449 (Fla. 1978), appeal dismissed, 441 U.S. 939, 99 S.Ct. 2153, 60 L.Ed.2d 1040 (1979).
The issue of whether MRTA is applicable to sovereignty lands is squarely presented here. The issue has two prongs. The first is whether the legislature intended to overturn the well-established law that prior conveyances to private interests did not convey sovereignty lands encompassed within swamp and overflowed lands being conveyed. We must assume that the legislature knew this well-established law when it enacted MRTA. We are persuaded that had the legislature intended to revoke the public trust doctrine by making MRTA applicable to sovereignty lands, it would have, by special reference to sovereignty lands, given some indication that it recognized the epochal nature of such revocation. We see nothing in the act itself or the legislative history presented to us suggesting that the legislature intended to casually dispose of irreplaceable public assets. The legislative purpose of simplifying and facilitating land title transactions does not require that the title to navigable waters be vested in private interests. Because we conclude that the legislature did not intend to make MRTA applicable to sovereignty lands, we do not address the second prong of whether the legislature could constitutionally make such an ex post facto divestment of sovereignty lands without explicitly basing it on the public interest. We note, however, although article X, section 11 of the Florida Constitution was adopted after the passage of MRTA, that section 11 is largely a constitutional codification of the public trust doctrine contained in our case law.
Finally, we agree with the district court in Mobil Oil that respondent Mobil's counterclaim was in rem in nature and local only to Polk County Circuit Court.
In summary, we hold that conveyances of swamp and overflowed lands do not convey sovereignty lands encompassed therein, that such conveyances without exemption of sovereignty lands do not legally estop the state from asserting title to sovereignty lands, and that MRTA, as originally enacted and subsequently amended in 1978, is not applicable to sovereignty lands.
We approve the portion of Mobil Oil holding that jurisdiction rested in Polk County and quash the remainder. We quash entirely Coastal Petroleum v. *345 American Cyanamid. The cases are remanded for further proceedings consistent with this opinion.
It is so ordered.
ADKINS, OVERTON and EHRLICH, JJ., concur.
BOYD, C.J., dissents with an opinion, in which McDONALD, J., concurs in part and dissents in part with an opinion.
BOYD, Chief Justice, dissenting.
Because I find that the circuit court and the district court were correct in their resolution of these quiet-title lawsuits, I must respectfully dissent. I can find no basis for holding that the deeds to the lands in question in these cases, which were duly executed by authorized public officials over one hundred years ago, may now be called into question under the public-trust doctrine or any other theory. I would approve the decisions of the district court of appeal.
The petitioners argue that the lands at issue in these quiet title actions, or some portions of them, lie below the high water marks of and thus constitute parts of the beds of certain rivers and streams that are in fact navigable and are therefore the property of the state by virtue of the public trust doctrine. The petitioners assert that the Trustees of the Internal Improvement Fund did not have authority to alienate lands underlying the waters of inland rivers and streams at the time of the execution of the Trustees' deeds forming the origins of the chains of title under which the various respondents claim ownership of the lands in question.
The essential fact upon which this case turns is that the lands were conveyed into private ownership without reservation of those portions underlying navigable waters. The legal descriptions in the deeds constituting the origins of the chains of title under which the respondents claim encompassed the lands in question. These deeds described the property to be conveyed by reference to the official government survey. These government surveys were made for the purpose of determining the proper classification of public lands in Florida, including a determination of what lands were swamp and overflowed lands and where navigable rivers and other bodies of water were located. The official surveys made in Florida were used by state and federal land officials as the basis for selecting the parcels to be patented to the state by the United States government as swamp and overflowed lands. South Florida Farms Co. v. Goodno, 84 Fla. 532, 94 So. 672 (1922). The original United States government surveyors were instructed to locate and meander all navigable rivers and other bodies of water. Lopez v. Smith, 145 So.2d 509 (Fla. 2d DCA 1962). The official surveys containing no meandering showing navigable rivers, the federal patents issued pursuant to congressional authorization under the Swamp and Overflowed Lands Act of 1850, the official state requests for such patents, and the Trustees' deeds of the lands in question as swamp and overflowed lands, taken together, constitute official, contemporaneous determinations that the lands in question were swamp and overflowed lands and that any waters lying thereon were not navigable. The Trustees' determination that land is of a character that gives them the authority to sell it is not subject to collateral attack. Pembroke v. Peninsular Terminal Co., 108 Fla. 46, 146 So. 249 (1933).
The cases upon which the petitioners place their principal reliance are Martin v. Busch, 93 Fla. 535, 112 So. 274 (1927); Broward v. Mabry, 58 Fla. 398, 50 So. 826 (1909); and State ex rel. Ellis v. Gerbing, 56 Fla. 603, 47 So. 353 (1908). However, many of the principles of law stated in these cases have been modified or at least qualified by later decisions. Moreover, these cases are factually distinguishable from the present case.[1] At the least it can readily be said that none of these cases *346 supports the proposition that land underlying a navigable river or stream simply cannot, as a matter of law, be conveyed into private ownership. To the contrary, the cited cases recognize that such lands, notwithstanding the fact that the state may have obtained title by virtue of its sovereignty, may be conveyed when the authority and intention to do so are clear. As has already been shown, there was authority and intent to convey the lands in question.
Numerous cases recognize that the state may convey the title to submerged sovereignty lands into private ownership, so long as the public trust safeguarding the rights of the public to the use and benefit of the waters is not violated. See, e.g., Gies v. Fischer, 146 So.2d 361 (Fla. 1962); Holland v. Fort Pierce Financing & Construction Co., 157 Fla. 649, 27 So.2d 76 (1946); Pembroke v. Peninsular Terminal Co., 108 Fla. 46, 146 So. 249 (1933); Tampa N.R.R. v. City of Tampa, 104 Fla. 481, 140 So. 311 (1932); State ex rel. Buford v. City of Tampa, 88 Fla. 196, 102 So. 336 (1924). The right of the public to the use of the water is the inalienable portion of sovereign ownership under the public trust doctrine. Florida law has long recognized that it is not necessary for the state to retain absolute ownership of the bed of a river in order to retain the control of the use of the surface waters for the benefit of the public.
The petitioners argue that the trial court should have allowed them to present evidence that the lands in question are under waters that were in fact navigable at the time of the original deeds from the state. Such evidence, they argue, would overcome the presumption of non-navigability arising from the lack of meandering in the survey. The fact of navigability at that time, they argue, would establish that the trustees had no authority to deed the river beds and would establish the sovereignty land reservation which they say exists as a matter of law. However, summary judgment without receiving such evidence was proper.
The title to land should rest upon a grant, not upon an evidentiary fact. Pembroke v. Peninsular Terminal Co. As I have stated above, the Trustees in making the deeds from which the respondents' titles derive made official determinations of the character of the lands and those determinations are not now subject to question. The petitioners have cited the noted treatise by Dean Maloney and others[2] for the proposition that the early official surveyors encountered difficulties which may account for the lack of meandering of rivers later known to be navigable in fact. Actually, the cited work offered this historical observation as a possible explanation for the fact that so many of Florida's inland lakes were not shown on the surveys. It is highly unlikely that the surveyors would have allowed the problems of swampy shorelines, snakes, and other hazards to deter them from noting the presence of an obviously navigable river. Thus it is appropriate to apply the concept stated in Odom v. Deltona Corp., 341 So.2d 977, 988 (Fla. 1977), that we should presume that the official surveyors did their work correctly, conscientiously, and as instructed.
The majority accepts the petitioners' argument that the trial court's judgment quieting title to the lands in question in the respondents violates the public trust doctrine by divesting the public of its common-law rights to the use and benefit of navigable waters. However, there is no such divestment of the public rights of use and benefit of the waters.
Contrary to the assertions of the petitioners and as discussed above with citations of authority, a determination that the bed of a river or stream is in private ownership does not divest the public of its rights in the use and benefit of the water for purposes such as transport, fishing, floating, and swimming if the river or stream is in fact useful for such purposes. When a riparian owner *347 holds title to the land between high-water mark and the thread of the stream (or owns both banks and the bed from high-water mark to high-water mark), such title is held subject to a servitude in favor of the public to pass over the water in boats if such use of the water is possible. Moreover, this public right does not depend on the river being in fact navigable in the sense of being useful for navigation for commercial purposes. Thus, to the extent that the original Trustees' deeds are taken as a determination that the rivers were not navigable, any such determination has no effect on public rights in the waters today if the waters are now in fact useful for navigational purposes. The Trustees deeded away only the proprietary interest in the submerged land. The right to the use of the overlying waters was inalienable under the public trust doctrine. Even if a river or stream is not navigable in the commercial sense but is used or useful for lesser degrees of navigation by small vessels, such as boats, canoes, and rafts, commonly employed in the recreational uses of rivers and streams, then the public retains the right to the use of the waters for such purposes. See, e.g., Elder v. Delcour, 364 Mo. 835, 269 S.W.2d 17 (1954).
Even were I to agree that the Trustees needed and lacked specific legislative authority to execute the deeds in question on the ground that the properties were sovereignty lands rather than swamp and overflowed lands, I believe that the doctrine of estoppel would support the lower courts' declaration of respondents' ownership. Florida law recognizes that where a grantor conveys land by mistake, he is estopped to later deny that he intended the conveyance as expressed in the deed. This principle has even been applied in a case where the Trustees not only made a mistake, but asserted that they lacked legislative authority to convey the lands in question. Trustees of the Internal Improvement Fund v. Lobean, 127 So.2d 98 (Fla. 1961). See also Trustees of the Internal Improvement Fund v. Wetstone, 222 So.2d 10 (Fla. 1969); Trustees of the Internal Improvement Fund v. Claughton, 86 So.2d 775 (Fla. 1956). Moreover, a deed will be held valid if the grantor, lacking authority to make the deed at the time, later acquires title or acquires the authority to alienate the property. That situation also obtains here.
The circumstances of these cases show that the doctrine of estoppel is properly applied here; these are classic cases for application of the doctrine of estoppel. The deeds were executed in 1883. At various times following that date, the respondents or their predecessors in title engaged in acts evincing the intent to exercise dominion and control over the lands in question. Some of the respondents or their predecessors in title have engaged in mining operations on the lands in question. If the Trustees disputed the respondents' title, they should have taken action to enjoin such operations and to evict the respondents long before this. The law should not come to the aid of one who is not diligent in asserting his own rights.
The respondents' "sovereignty-lands" argument fails for another reason. In 1819, the territorial legislature of Florida adopted a statute declaring the common law of England to be of force in Florida. The statute, in modified form but unchanged as to substance, is still in effect and is now codified as section 2.01, Florida Statutes (1985), and provides as follows:
The common and statute laws of England which are of a general and not a local nature, with the exception hereinafter mentioned, down to the 4th day of July, 1776, are declared to be of force in this state; provided, the said statutes and common law be not inconsistent with the Constitution and laws of the United States and the acts of the Legislature of this state.
Thus English common-law rules concerning land ownership and land transfers, as they developed up until July 4, 1776, were, have been, and continue to be the law in Florida unless and until modified by statute or court decision.
*348 Even if we accept, as the majority does, the proposition that title to lands underlying navigable rivers was vested in the state upon admission into the Union, this does not compel acceptance of the further proposition that such lands were then inalienable under the public trust doctrine. From medieval times right on through the eighteenth century, the common law of England recognized land grants and land deeds vesting title to land underlying non-tidal but navigable rivers in private riparian owners. See Hardin v. Jordan, 140 U.S. 371, 11 S.Ct. 808, 35 L.Ed. 428 (1891). Therefore, at the time of Florida's admission into the Union, there was no impediment to the execution of deeds of such lands into private ownership. The fact that in other American jurisdictions, courts modified the English common law by imposing a public trust on the state's ownership of such lands, see, e.g., Illinois Central R.R. v. Illinois, 146 U.S. 387, 13 S.Ct. 110, 36 L.Ed. 1018 (1892), could not have affected the land law of Florida, which still followed the English common-law rules. The earliest Florida court decision the majority is able to cite in support of the existence of the public trust doctrine is State v. Black River Phosphate Co., 32 Fla. 82, 13 So. 640 (1893), which was not decided until after the execution of the deeds in question in these cases.
In addition to the common-law rule allowing for grants of river bottom land to riparian owners, notice should also be taken of the effect of chapter 791, Laws of Florida (1856), in which the state expressly divested itself of and granted to riparian landowners "all right title and interest to all lands covered by water, lying in front of any tract or land ... lying upon any navigable stream ... as far as the edge of the channel, and hereby vest the full title to the same in and unto the riparian proprietors." Sixty-five years later, the legislature amended the statute to provide that the title would not vest unless and until such a riparian owner had filled in or permanently improved such submerged land. Ch. 8536, Laws of Fla. (1921). But in the meantime, many riparian proprietors, in reliance on the 1856 legislation, had exercised dominion and control over various lands underlying navigable waters, for purposes other than the building of wharves and so forth, as envisioned when the 1856 legislation was passed. Decisions of this Court construing the 1856 act recognized that the state could grant the proprietary interest in the submerged lands without violating the public trust for protection of public rights in the use of the waters. See, e.g., Alden v. Pinney, 12 Fla. 348 (1869); Geiger v. Filor, 8 Fla. 325 (1859).
The decisions of The Florida Supreme Court from 1856 up until 1893 demonstrate that Florida followed the English common-law rules that land under navigable tide waters was titled in the sovereign, but could be alienated subject to public rights of navigation and fishing; and that the title to land underlying navigable inland rivers could be held in private hands subject to similar public rights. See State v. Black River Phosphate Co., 27 Fla. 276, 9 So. 205 (1891); Bucki v. Cone, 25 Fla. 1, 6 So. 160 (1889); Sullivan v. Moreno, 19 Fla. 200 (1882); Rivas v. Solary, 18 Fla. 122 (1881).
As the foregoing discussion of legal authorities shows, the suggestion that the state must hold title to all lands underlying navigable rivers and streams in order to protect the rights of the public to the use and enjoyment of the waters is based on a misconception. As in many other areas of property law, the law recognizes various degrees of legal rights and interests in the same property and does not demand that one person hold the entire "bundle of sticks." The sovereign trust in favor of the public to use navigable waters for fishing, navigation, and recreation can be preserved inviolate even though the beds of such rivers and streams be titled in private owners.
Some of the petitioners and amici curiae in these cases, as well as observers in the communications media and among the public generally, have inaccurately suggested that the state must have title in order to protect wetlands from environmental damage. However, the legal proposition that *349 parts of the lands underlying rivers or streams are in private ownership has nothing whatsoever to do with the plenary power of the legislature to regulate the use of such property for the purpose of protecting the natural environment. The scope of that regulatory authority is very broad and fully adequate to the purpose of protecting Florida's environment against harmful activities. See, e.g., Atlantic International Investment Corp. v. State, 478 So.2d 805 (Fla. 1985); Graham v. Estuary Properties, Inc., 399 So.2d 1374 (Fla. 1981), cert. denied, 454 U.S. 1083, 102 S.Ct. 640, 70 L.Ed.2d 618 (1982).
Contrary to the various suggestions that the present cases pertain to issues of environmental protection, it should be made known that what these cases involve is money. If the Board of Trustees is able on remand to succeed in showing the rivers in question to have been in fact navigable in 1845, then the Board's title to the submerged lands will be confirmed. In that case the Board's leases to Coastal Petroleum may be held valid. Contrary to suggestions of ecological concern, there is no showing that if the board prevails, phosphate mining will cease. As lessee, Coastal Petroleum's only interest in these lands is to extract mineral royalties. Thus any lingering notions that these cases concern ecology should be dispelled. These cases concern money and the question of who gets it.
Much has been written and spoken, in the communications media and elsewhere, concerning the legal issues in this case and the related political issues. Many have suggested that the courts are being asked to give away state-owned lands. The truth is that the lands in question here, as well as other lands, were legally conveyed by authorized state officials. It may very well be the case that in doing so, public officials failed to exercise care and diligence on behalf of the public. But the fact that decisions of former officials were unwise is no reason to now penalize innocent purchasers who paid market value and relied upon state officers' authority to sell. I can see no constitutionally permissible basis for the state to recover such lands except by purchase or by eminent domain based on a public purpose and the payment of just compensation.
There has also been much public discussion of the effect of the Marketable Record Title Act. I agree with the district court's holding that MRTA applies with the same force to land claims of the state as to those of private claimants. The law was intended to apply and should apply to all real estate claims without an exception for those of the state. Under MRTA, the claims of the state in these cases are asserted too late and cannot be revived. If private claimants were to seek to call into question the deeds of an ancestor given over one hundred years ago, based on mistakes, reservations or infirmities not preserved by re-recording under the statute, such claims would be barred under MRTA. The same rule should apply against the state because of the overriding interest in the stability and marketability of land titles.
Constitutional protection of private property rights is an essential feature of our form of government and our society. Whenever the awesome power of government is used to extract from people their lives, liberties, or property, their only refuge is in the courts. The circuit court orders in these cases correctly preserved the vested rights of real property owners against attempted state confiscation. The district court was in my view correct in affirming those circuit court judgments. I would approve the district court decisions. I therefore respectfully dissent.
McDONALD, J., concurs in part and dissents in part with an opinion.
McDONALD, Justice, concurring in part and dissenting in part.
I concur with Justice Boyd's dissent on all issues except to the effect of the Market Record Title Act. I do not believe it applicable to the beds of navigable rivers and streams and would not extend Odom v. *350 Deltona Corp., 341 So.2d 977 (Fla. 1977) beyond the facts of that case.
NOTES
[1] A meander line creates a rebuttable presumption of navigability but is not necessarily a boundary line unless it is expressly made one of the calls of the boundary. However,

where a meander line is run under State authority for the purpose of identifying, locating and establishing the true line of ordinary high water mark of a body of navigable water, and the lands below high water mark are sovereignty lands, and the lands above high water mark are swamp and overflowed lands or other uplands subject to ordinary private ownership, in such case the meander line, if so intended and if duly and fairly ascertained and established, becomes, and, unless duly impeached, continues to be, a boundary line limiting the extent of conveyances of the adjacent uplands or of permissible grants or conveyances of the sovereignty lands below ordinary high water mark.
Martin v. Busch, 93 Fla. at 565, 112 So. at 284.
[2] See discussion and cases cited in Comment, Unfinished Business  Protecting Public Rights to State Lands From Being Lost Under Florida's Marketable Record Title Act, 13 Fla.St.U.L.Rev. 599, 606-08 (1985).
[1] An obvious distinction is that the most recent of the cited cases was decided nearly sixty years ago. None of these cases involved nearly one hundred years of state acquiescence in a private person's exercise of ownership rights over the lands in question.
[2] F. Maloney, S. Plager, and F. Baldwin, Water Law and Administration: The Florida Experience (1968).