GEORGE J. ALDEN AND SEVILLA ALDEN, HIS WIFE, APPELLANTS, vs. JOHN PINNEY, APPELLEE.

1. The plat of a town referred to in a deed as containing a description of the boundaries of a lot fixes these boundaries as satisfactorily as natural objects, and if in a deed referring to a plat as containing the general conformation of the lot granted, its locality is given by well-defined lines, and the width of the lot is given by measurement, one of the calls is in such language as it may indicate either aspect or a natural boundary, this doubtful call must be given that signification which is most consistent with the evidence in the case.

2. All obstructions to the navigation of a bay or harbor, not authorized by the Legislature, are public nuisances, but all structures built upon submerged soil between the line of high tides of a navigable bay and its chan-

nel are not *ipso facto* nuisances ; whether they are nuisances is a question of fact to be determined in each case.

3. An obstruction to navigation, which is a public nuisance, being the subject of a proceeding at the instance and in behalf of the State, by which it may be abated, and the person guilty of its erection punished, an individual cannot maintain an action, either at law or in equity, to have it abated, or to prevent the creation of other like nuisances, unless he sustains damage beyond and in addition to that which falls alike upon the public, and he must seek relief in a court of law or equity, as the nature of his special injuries and the remedies for them should determine to be appropriate.

4. Where the erection of a structure upon a public road or street, in a city, is threatened, the structure being a public nuisance which works special damage to a neighboring proprietor in the enjoyment of his property in the vicinity, as well as to the value of it, a court of equity will grant an injunction to restrain its erection, but if the structure is some distance from the true line of the road or street, and does not interfere with the use to which the road is dedicated, it will not, on this ground, restrain its erection.

Appeal from Escambia Circuit Court.

A full statement of the facts and pleadings is contained in the opinion of the court.

*C. C. Yonge,* for Appellants.

. Bill to compel defendants to remove an ice house from a water-lot fronting a lot in city of Pensacola claimed by complainant, and to enjoin them from erecting other buildings on said front, &c.

Defendants deny the title of the complainant, allege title in themselves, deny that the structure is a nuisance, and demur for want of jurisdiction, there being adequate remedy at law.

Argument :

1st. That the demurrer was not disposed of in the circuit court, and case should be remanded. Taylor vs. Baker, 1 Fla., 245 ; McKinnon vs. McCullom, 6 Fla., 376 ; Pearce & Son vs. Jordan, 9 Fla., 529.

2d. The circuit court should have sustained the demurrer.

1. Because if, under the Riparian act of 1858, complainant be the owner of the batture in front of lot E, then his remedy was at law by action of ejectment, trespass, or other appropriate action.

Either the want of an equitable title or the absence of a legal title is sufficient reason for denying equitable relief. McAffee vs. Lynch, 26 Miss., 267.

That full compensation can be had at law is the great rule for withholding the strong arm of the Chancellor. Pusey vs. Wright, 31 Penn., Hilliard on Injunctions, §23, and note A.

Injunction will not be granted where adequate remedy at law, at least till the right to redress be established at law. Arnold vs. Kelper, 24 Mis., 273. The general rule is that action should be brought to establish right before injunction is asked. U. S. vs. Parrot, 1 McAllister, C. C. Rep., 271. If title of complainant be denied, must show former recovery or long possession. Hilliard, §33.

Legal right must be asserted by legal means, and equity will not lend its aid where justice does not imperiously demand it. Hilliard, §36; Bosly vs. McKim, 7 Har. & I., 468; Irwin vs. Dixon, 9 Howard, S. C.; Mohawk vs. Utica, 9 Paige, 554.

Equity interposes to restrain irreparable mischief, suppress interminable litigation, or prevent multiplicity of suits, and in these cases will ordinarily require that right be first established at law. Bean vs. Coleman, 44 N. H., 539; Hilliard, 270, 271.

Must be case of strong or imperious necessity, or right must have been previously established. 271.

Where matter complained of may or may not be a nuisance, it must be first ascertained by a jury. Kirkham vs. Handy, 11 Humphreys, 406; 1 Grant, 412. Equity will not interpose, when damages will compensate. Gray vs. Ohio, 1 Grant, 412.

Nor if evidence is conflicting, and injury doubtful or contingent. Loughlin vs. President, 6 Indiana, 223; Butler vs. Rogers, 1 Stock, 487.

All this doctrine especially applicable when nuisance is to land.   Coe vs. Lake Co., 37 N. H., 254.

Amount of damage, sometimes material, to consider.   H., 272. As to public nuisance, see H., 273, §3.

Not public, because a nuisance to *several persons.*   H., 275, §8.

Test as to equity jurisdiction in Pennsylvania case, is loss of health and sleep, the enjoyment of quiet and repose, and the comforts of home, which cannot be compensated in damages. H., 269, 270.

No individual can prosecute for public nuisance in his own name (by injunction), unless such nuisance be irreparably injurious to himself.   Spooner vs. McConnell, 1 McLean, 358, 359 ; 18 Ves., 215 ; 6 John, ch. 439 ; Atty. Genl. vs. Nichol, 16 Ves.

Equity will take jurisdiction of nuisance at instance of private party only when he is in imminent danger of suffering special injury, for which the law would afford no adequate remedy.   City of Georgetown vs. Alexandria, 12 Pet., 98.

Though nuisance public, if extreme probability of irreparable injury to property of plaintiff, with danger to its actual existence, injunction will be granted.   Crowder vs. Tinkler, 19 Ves., 616.   Public nuisance to obstruct highway, but can every one having right to travel ask injunction ?   1 McLean, 359, 360.

The person obstructing would be liable to public prosecution. 1 McLean, 360.

Not enough that plaintiff says he is injured.   He must show how he is injured.   1 McLean, 360.

To be deprived of " free circulation of air and an unobstructed view," is too fanciful and is not of appreciable value.   Its value would depend upon the constitutional temperament and disposition of the individual owner of an adjacent lot.   Some persons would prefer to be relieved of the glare caused by a large exposure of water, and some protection from .the wind might be agreeable to some constitutions, especially if subject to chills. The damage, if any, is too slight.   *De minimis non curat lex.*

The principle is, that in case of a public nuisance where suit

brought by private person, he must aver and prove special injury and damage. 12 Peters, 98.

If the water front is a *common*, then the question whether the obstruction below high-water mark is a nuisance is a *questio facti*, and not a *questio juris*, and must be determined by a jury. Angel on Tide Waters, 145, also 200.

If the *locus in quo* is the property of the plaintiff, as he asserts, then his remedy is by appropriate action at law to oust the intruder.

If it belongs to the public, then the right of occupancy belongs to the first occupant, and this right is called the *jus preventionis*. The only question then is, does this occupancy injure the public? Angel, 168, 169, 170.

Whether it is an injury, is to be determined by a jury upon evidence. Angel, 162.

That the Riparian act of 1856 provides that a remedy "by bill in chancery or at law," ———— does not show that the appropriate remedy in this case is in chancery. Complainant could as consistently argue that because the doors of both courts were opened, that he could avail himself of an action at law, where chancery furnished the appropriate remedy.

3d. But should it be held that a riparian proprietor has a standing in equity, for the relief prayed in this bill, then I insist that the proofs do not show that the complainant is a riparian proprietor.

1st. It is insisted by complainant that a common or street cannot be the subject of a grant. If it should appear, then, that a street or common intervened between lot E, and high-water mark, then, according to this doctrine, the city could not have conveyed title to Gonzàlez, under whom complainant claims to the fee to the street or common, or to the site of the ice house, whether any street intervened or not.

2d. But the city did not undertake to convey, the land to the bay, but only such parcel of land as was included within definite metes and bounds, extending 58 feet 8 inches from Ricova street,

and 90 feet on the bay. The language is not 58 feet 8 inches *to* the bay, but 58 feet 8 inches from Ricova street, and when the deed comes to describe the east and west line of the lot, it says, "90 feet on the bay." That is, fronting the bay, or with a bay exposure, &c. Pensacola is said to be on the bay of Pensacola, and Jacksonville on the St. Johns river, and yet many lots in each city are a great distance from the water, as is said of Naples in a case in 6 Martin, Rep. The words, then, "90 feet on the bay," are not descriptive of boundary, but of aspect.

3d. Though a natural boundary will control course and distance, yet a boundary by a natural object that is inconsistent with the other calls of the deed, will be controlled by the other calls that are inconsistent therewith. See Barklay vs. Howell, 6 Peters.

4th. Again: The extent of lot E being towards the bay, 58 feet 8 inches from Ricova street, and Ricova street having, as is shown by the map in evidence, a straight boundary on the north, must also have a straight boundary on the south, which cannot be if the water line be the boundary.

5th. The language in the deed of the city to Gonzalez is, " according to the allotment of the Cabildo and the new plan of the city." A copy of the map containing this allotment and plan is in evidence, and shows the southern boundary of lot E to have been, at the time when this allotment was made in 1814, quite distant from the water line. The survey made by T. Moreno, city surveyor, in 1866, shows the southern boundary to be about 62 feet from the water line, which is about the distance it was in 1814, when the allotment was made, as is shown by the map.

6th. The complainant relies on a solitary witness to show that lot E extended to the bay; Francis Touart; and he evidently alluded to storm tides. No importance was attached to his testimony by the defendants, as is shown by the cross examination, and it really, as it stands, amounts to nothing. He says: "High tides ran ten or twelve feet from foundation; at

some tides water went over the house.   Water went over in
storm."   So, "some tides," and tides "in storm," and "high·
tides," which, in this connection, evidently mean such high tides
as prevail in storms, go over a large portion of the city of Apa-
lachicola and of the city of Key West; but it has not been pre-
tended that lots that reach the water on such occasions are wa-
ter lots, or such lots as entitle the owners to riparian rights.   If
witness Touart meant anything else, then he is contradicted
by both the maps in evidence, and by T. Moreno, the city sur-
veyor.

4th.  Assuming, then, that it is not proved that lot E did
reach the water, and it is not required that defendant should
prove that it did not, what rights has the complainant to land
on the other side of the open space or street left "in the allot-
ment of the Cabildo and the new plan of the city?"

This allotment and plan was made in 1814, from which date,
at least, this space has been left open as a street or common.
At the time of the allotment there was no city corporation in
existence in which the title to lot E, or the dedication or fee of
the street, could vest.   The title was in the crown of Spain, and
passed to·the United States under the treaty of 1819, and by
act of Congress of 1826 passed to the city of Pensacola, the
town having, in the mean time, been incorporated, to wit, in
1862.

The action of the Spanish authorities in laying off lot E and
the adjacent streets, and leaving this space open as a street,
and the non-action of the United States in asserting title thereto,
and suffering it to be used as other streets, was as effectual a
dedication as if it had been named as a street.   A street is not
constituted by being named, or by being called a street.   It is
the use to which it is appropriated that constitutes a street.   A
highway in a town is called a street.   In the country it is called
a road.   This open space was as effectually dedicated as was
the open space in New Orleans, which was called a "quay,"
and to which the Supreme Court, in case of U. S. vs. City of

New Orleans, 10 Peters, say the U. S. had no claim. The doctrine contended for is, that a city cannot appropriate property that is dedicated for a particular use, to any use inconsistent with the dedication; and I insist that it is incumbent on the complainant to show that the erection of an ice house on the batture or soil under the shoal water, 90 feet at least from high-water mark, is inconsistent with the right of way in and on the open space between lot E and high-water mark, before he can ask the interposition of a court of law or equity.

The allegation that the city has sold the site of the ice house to the defendants, goes for nothing. If the city had no title, the sale is a void act. If it had title, then it had the right to sell. The only material inquiry is, the use to which the site is appropriated. Does the ice house interfere with the highway along the beach, the line of which is 90 feet distant? It is absurd to suppose that it does. But if there is doubt about it, then the question should have been referred to a jury to determine, and there was no evidence before the court of chancery to enable it to determine the issue, if it were competent to determine it.

The authorities do not establish the proposition, that land held subject to a servitude may not be used for other purposes than those at first contemplated, but only that the use shall not interfere with the servitude to which it was subjected. In the case of Barklay vs. Howell, 6 Peters, it was held that the open space south of lots on Water street was dedicated as a street, and the appropriation by the city of Pittsburg of the margin nearest to the river, (there being sufficient space left for a street,) for wharves, was not inconsistent with the dedication, and the city was permitted to use these wharves as a source of revenue. This was certainly not as a highway or street.

In case of U. S. vs. City of New Orleans, 10 Peters, court held that the erection of a house on the quay, which was held under a dedication as a quay, the house not interfering with the use of the quay, was not improper.

356 SUPREME COURT.

George J. Alden and Wife vs. John Pinney—Argument of Counsel.

But whether the defendants have acquired any right to erect the structure complained of or not, from the city of Pensacola, or otherwise, or whether they have acquired title to the site of the ice house, it would seem to be very clear that the complainant has none. It is conceded that the dedication of a street does not necessarily divest the owner of the fee, but it does not necessarily follow that the purchaser of an adjacent lot acquires the fee to the street. He may, if apt words are used to convey it. The word appurtenances may, for illustration, convey the fee to the street, or other expressions showing the purpose of the grantor. It is certainly competent for the purchaser to sell an adjacent lot, retaining the fee in the street. In the deed of the city to Gonzalez, we insist the city did not part with the fee to any part of the street. See the deed.

But where the language of a deed does convey the fee to the adjacent street to the grantee, then the fee extends only to the centre of the street, unless the grant be to property on both sides of the street. This subject is fully discussed and decided in case of Ogden vs. Banks, 2 Black., S. C. Rep., in which case the street called Sand street bordered on the shore of Lake Michigan, and was intended to be 66 feet wide, and was of that width where there was land enough to admit of it; but opposite the lot of the plaintiff, owing to the proximity of the lake, there was less than 33 feet of land, one-half 66. It was held that the purchaser of lot 54, adjacent to Sand street, which ran into the lake, took, under the language employed in the deed, the easterly half of the fraction of the street that bordered the lake, subject to the public use, and the original proprietor retained the fee in the westerly half which bordered on the lake, and was, of course, entitled to the accretion and all riparian rights. 2 Black., 68.

My argument then is:

1st. That the complainant having an adequate remedy at law, the court below ought not to have taken jurisdiction of the cause.

2d. That the court ought to have referred the question of title to a jury for determination.

3d. That the question of nuisance or no nuisance ought to have been determined by a jury.

4th. That if it was compctent for a court of chancery to determine it, there was no evidence before the court to establish the fact.

6th. That the evidence did not show that complainant was entitled to riparian rights, because,

1st. It did not show that lot E extended to high-water line.

2d. That apt words of conveyance were not used to convey the fee of the street to Gonzalez.

3d. That if conveyance was sufficient to convey the fee, that it would only extend to the centre of the street or common.

5th. That the use of the site of the ice house for an ice house was not inconsistent with the servitude under which the space to which the site of the ice house was appurtenant—to wit, the space between lot E and the water—was held.

Lastly, That if all these grounds should be overruled, that the defendant was entitled to have had the judgment of the court below upon his demurrer, and the case should be remanded for further hearing.

*Campbell and Perry* for Appellee.

On the map of the city of Pensacola, known as the plan of the Cabildo, made by Vicente Pintado in 1814, there is a lot fronting on the bay designated by the letter E, and referred to in a marginal note as a lot reserved for "a market-house and store-houses." In Executive Doc., page 166, lot E is described as "grounds reserved for the market-house and public magazines." The south line of the lot did not, according to the map, extend to the water, and there is between the south line and the bay an open space, which extends along the front of the town, which space is without designation as a street, road, or quay. The report of the Land Commissioners, however, fixes the character

of that space, and shows that it indicates only a road along the coast without prejudice to the rights of "alluvion and avulsion" in the adjacent proprietors. Executive Doc., 74, 75.

The width of lot E is not stated on the map of the Cabildo, but according to the scale it is over sixty feet.

By the Act of Congress, April 22d, 1826, Sec. 7, "the lots reserved for market and other public uses in the plan of the constitutional Cabildo, are relinquished and confirmed to the corporation of Pensacola."

On 19th February, 1827, a part of lot E was conveyed by the city of Pensacola to Manuel Gonzalez in exchange for another lot; and in the resolution of the Board of Aldermen authorizing the Mayor to execute the conveyance, as well as in the deed itself, the portion intended to be conveyed is described as follows: "The easterly part of the new market-lot, where the flagstaff formerly stood, and marked by the City Surveyor, ninety feet in front on the bay, and fifty-eight feet        inches in width, agreeably to the allotment of Cabildo, and the new plan of the city." On the same day, 19th February, 1827, the following resolution was adopted by the City Council: "*Resolved*, That the City Surveyor be requested to survey, and make an accurate plan of the building lots and enclosures as they now stand, and also a plan of the original grants on the bay front, from the east corner of the market-house to Velasaca's corner, in order to enable the City Council to determine upon a permanent bay front."

Pinney, complainant in the court below, derives title to the above described portion of lot E by mesne conveyances from Manuel Gonzalez, who, with those claiming under him, have held adverse possession of the lot since 1827, a period of over forty years, during which time it has been annually taxed by the city to Gonzalez, and those claiming under him.

Francis Touart proves that ordinary high-tide mark was about ten or twelve feet from the warehouse which he assisted in building twenty-five years before his examination; and

Theodore Moreno, surveyor, proves that the south line of the lot, according to the calls of the city's deed to Gonzalez, would be about thirteen feet five inches from the foundation of the building.

On 4th August, 1827, a committee appointed by the Board of Aldermen of the city of Pensacola to inquire into the expe- diency of establishing a building line on the bay, reported, with the approbation of the Board, "that the English and Spanish plans of the town show clearly and distinctly that the space be- tween the water-lots and the bay was reserved as *common property* for the *use* and *benefit of the city*, and designed for the erection of wharves and docks, the establishment of streets, and other general uses for the common benefit."

All that portion of lot E not embraced in the Gonzalez deed was in 1867 leased to Lingan & Co. for a period of ten years, for the purpose of erecting a planing-mill.

In 1866, a right of property was asserted by the corporation to the entire water front, so absolute as to authorize its sale and appropriation to any use whatever. At the same time a similar claim was asserted by Alexander C. Blount and Peter Knowles under a pretended grant, alleged to have been made by the Spanish Government in 1817 to Vicente S. Pintado, of whose heirs they assert themselves to be trustees, but without any evi- dence of their right or authority so to act. On 21st February, 1866, these rival claimants entered into a covenant, in which they agree to lay off into lots and sell the entire water front of the city from the shore to the channel of the bay. Lots were accordingly laid off and sold, and Sevilla Alden, appellant, pur- chased several in front of that portion of lot E owned by Pin- ney, and upon said lots erected an ice house, and in their joint answer she and her husband assert their right to erect other structures.

The covenant between the city and Blount and Knowles pro- vided for a settlement of the question of title as between them by an *agreed* case to be submitted to the Supreme Court of the

United States by appeal from the District Court. Subsequently a resolution was passed by the City Council requiring the City Attorney *to institute suit against the claimants under the grant,* although Pintado has not been in Florida since 1816, and there is no evidence of the assertion of title by any person claiming under him since 1826, except the self-constituted trustees of his heirs, Blount and Knowles. The resolution asserts it was passed in accordance with the "plighted faith" of the city; but when or how that faith was plighted does not appear.

No original grant to Pintado was produced at the hearing in the circuit court. The paper in the record offered at the hearing as evidence of the grant is a copy of a document found in the archives at Pensacola, which purports to be a copy of a copy of the original grant, the original copy having been made at Havana on 18th October, 1821, by Mauricio Poras Pita, notary of war, who was not the custodian of the original, and asserts in his certificate that he returned the original grant to "the interested party." The paper in the record is in fact a copy of the documents upon which the Land Commissioners acted in 1825, and in reference to which they say: "They are copies from Havana obtained subsequent to 24th January, 1818, when we are entitled to the original under the solemn stipulations of the treaty between Spain and the United States." Executive Doc. Report 10, pages 70 to 76.

That portion of the pretended grant, of which the *locus in quo* is a part, is particularly described in certificate C, and is part of the 10,000 arpents of the "royal domain" referred to in the concession. Besides the 10,000 arpents, of which the *locus in quo* is a part, there are a number of city lots embraced in the grant. Both the lots and the 10,000 arpents are granted "without prejudice to the third," and again, "without prejudice to a third who holds a better right;" and with the condition to build on the one, and cultivate and improve the other in the most convenient manner according to the disposition of the matter for the peopling of that province." In reference to

the water property the grant says, "in full property and for the purpose of constructing wharves and houses for bathing, reserving and saving not only the *rights* of *his majesty*, but also those of the public, at all times, whenever it becomes convenient, and it be designed to construct wharves with whatsoever funds, municipal or common, intending the exclusion only with respect to particular individuals."

The Land Commissioners in 1825 rejected the grant because no evidence of its authenticity was presented to them except copies as above stated; and because "the character of the claim to part of the bay and St. Rosa's Island is calculated to create the presumption of fraud."

The Act of Congress 23d May, 1828, confirms the grant to the extent of the quantity contained in one league square, or 5,760 acres; but it is expressly provided that what is embraced in certificate C, *i. e.*, the water front, shall constitute no part of the quantity confirmed; and the relinquishment of the excess over and above the quantity contained in a league square is made a condition precedent of the confirmation.

Neither Pintado, nor any one claiming under him, had, up to the time of filing the bill, ever built a bathing-house or wharf in front of the town.

PLEADINGS.

The bill was filed in the court below by Pinney, the appellee, against the appellants. It alleges that complainant is the owner of a part of lot E as above stated; that according to the plan of the city of Pensacola, referred to in the deed from the city of Pensacola to Gonzalez, there is no street between the lot and bay; that at the time the deed to Gonzalez was executed the bay was the southern boundary of his lot; and he is accordingly entitled to all the rights and privileges of a riparian owner, amongst which are those of accretion; free access to the harbor from his lot without let or hinderance; an unobstructed

35

view; and a free circulation of air, as well as all the other privileges appertaining to a lot fronting on the bay. It further alleges that complainant, and those under whom he claims, had for thirty-nine years enjoyed all the privileges incident to the ownership of a lot fronting on the bay; that the bay in front of his lot had during all that period been free from obstructions until respondents Alden and wife erected the structure referred to; and that the city could not sell the batture in front of complainant's, or authorize in any manner the violation of his rights derived under the deed of the city to Gonzalez. And it prays that respondent may be required to remove the structure complained of, and that they may be enjoined from erecting any others in front of complainant's said lot.

The answer neither admits nor denies complainant's title to the portion of lot E claimed by him. It alleges upon information and belief, that the lot did not extend to the bay, but extended only fifty-eight feet and eight inches from Recova street towards the bay; and alleges that the description of " said lot set forth in the deed from the city to the said Manuel Gonzalez is false and incorrect, and not agreeably to the plan of the Cabildo, and the new plan of the city." It admits the erection of the structure, mentioned in the bill, in front of complainant's lot, and asserts the right of respondents to erect other structures, by virtue of a purchase of lots in front of lot E from the city of Pensacola, and the heirs of Pintado, to whom the *locus in quo* was granted by the Spanish Government; and that the shallows in front of lot E were free from obstructions until the erection of said structure by respondents; and objects to the relief prayed by the bill, because complainant had a complete remedy at law.

### DECREE.

The circuit court decreed the relief prayed by the bill; and from that decree an appeal was taken to this court.

ARGUMENT.

The appellee asserts five general propositions in support of the decree of the circuit court.

First. The title of appellee to that portion of lot E embraced in the calls of the deed of the city to Manuel Gonzalez is perfect.

Second. All the proprietary rights which the city did or might have enjoyed as incident to the ownership of that portion of said lot are vested in the appellee; and he alone is entitled by virtue of such ownership to all the rights and privileges conferred upon owners of water-lots by the act of the General Assembly for the benefit of commerce. Laws 1856, page 25.

Third. The existence of a quay, street, or road along the shore between lot E and the bay, did not authorize the city to lay off the batture or shallows of the bay into lots and sell them to individuals to be enjoyed as private property.

Fourth. The appellants cannot justify the wrong of which the bill complains under the grant alleged to have been made to Vicente S. Pintado by the Spanish Government.

Fifth. That either as a riparian proprietor whose individual rights have been violated and threatened with further violation; or as a front proprietor peculiarly injured by the infraction of a public and common right, appellee was entitled to apply to a Court of Equity for the relief for which his bill prays, and which the circuit court granted.

First. The title of appellee to that portion of lot E embraced in the calls of the deed of the city to Manuel Gonzalez is perfect.

Lot E was the property of the King of Spain, for it was set apart for his magazines, as well as a retail market. It passed under the treaty to the United States; and by them it was relinquished and confirmed to the corporation of Pensacola by the Act of Congress of 1826. IV. Stat., 284.

Observe the difference in the language employed in the Act of Congress in connection with the "market-lot," and lots of that class, and that used in reference to other lots, such as those for school, church, &c.

That the term "market-lot" used in the Act of Congress and the city's deed to Gonzalez, is employed as descriptive of the lot, rather than as indicative of any special dedication as a market lot, is shown by the marginal note of the map of the city, and Executive Doc., page 166, where it is designated as a lot for storehouses or magazines as well as a market.

That the title acquired by the city under the Act of Congress was in the estimation of her officials strictly proprietary, is shown,

First. By the conveyance to Gonzalez.

Second. By the lease to Lingan & Co.

But admitting a dedication of the lot for a market, the legal title at least was in the city under the Act of Congress 22d May, 1826, and the use in the people, of which the corporation was the trustee. The case then presented is that of a trustee conveying the legal estate, not only with the acquiescence of the cestuis for forty years, but with their express annual assent for that period by the annual taxation of the lot.

This, then, is the case of a grant made with the assent or acquiescence of every person who had a right to question it.

Again, if the title of the lot was vested by the Act of Congress of 1826, in the corporation, the title is not in the United States, nor in the State; and therefore the statute of limitations has perfected appellee's title according to the calls of the deed of the city to Gonzalez.

Rowan's Ex'rs. vs. Portland, 8 B. Mon., 232; Armstrong vs. Dalton, 4 Dev., 566; Commissioners vs. Taylor, 2 Bay, 282; Fox vs. Hart, 11 Ohio, 414; Angel on Highway, 311; Cincinnati vs. First Presbyterian Church, 8 How., 238; Camden Orphan Asylum vs. Lockhart, 2 McMullen, 84; County of St. Charles vs. Powell, 22 Miss., 525; People vs. Clark, 5 Selden, 349.

Second. All the proprietary rights which the city did or might have enjoyed as incident to the ownership of that portion of said lot are vested in the appellee; and he alone is entitled in virtue of such ownership to all the rights and privileges conferred upon owners of water lots by the General Assembly for the benefit of commerce. Laws 1856, page 25.

According to the common law, where land is situated on tide waters, the boundary between the rights of the sovereign and the subject is ordinary high-water mark. Angel on Tide Waters, 66, 71, note.

Under the civil laws, which prevailed in Florida whilst it was a Spanish colony, the limit of a subject's right was the mark of the highest winter wave. Ibid.

Upon the change of sovereignty that limit was regulated by the laws and policy of the new sovereign, and ordinary high tide became the limit and the line of separation between the proprietary rights of the city in lot E, and the rights of the United States as trustee of the embryo State. Pollard vs. Hagan, 3 How., 212.

The deed from the city to Gonzalez calls for "ninety feet in front on the bay;" and, in that call, is necessarily embraced all the property the city owned south of the north line of lot E for a width of ninety feet.

But it is argued that the call for "ninety feet in front on the bay" indicates aspect, rather than boundary. Between these constructions the one most favorable to the grantee must be adopted. Broome's Max., 129; Stewart vs. Preston, 1st Fla., 10.

But it is insisted in the answer that the calls of the deed are false and utterly inconsistent with the limits of lot E as defined on the map of the city. This is a fatal admission; and proves, as appellee insists, that the city's deed to Gonzalez was *intended* to fix a new south boundary to the lot conveyed, to wit: *the bay*, whether ordinary high-tide mark should be found north or south of the south line according to the plan of the Cabildo. The

"allotment of Cabildo" was in other respects to be observed, and in order to ascertain the east and north lines of the lot, reference must be had to that allotment. The west line would be drawn from the extreme western limit of the bay line to the north line according to the "allotment of Cabildo" and the "new plan of the city."

That the bay and the north line of lot E cannot, *according to the "allotment of Cabildo,"* be connected by a line of fifty-eight feet and —— inches is of no significance, for distance always yields to boundary, whether natural or artificial. Doggett vs. Willis, 6 Fla., 482; Newsom vs. Pryor's Lessee, 7 Wheat., 7; Cleveland vs. Smith, 2 Story's R., 278; McPhaul vs. Gilchrist, 7 Ire., 169; Gilchrist vs. McLoughlin, 7 Ire., 310.

But a slight examination of the testimony will reconcile the apparent contradiction between the plan of the city and the calls of the deed.

The plan indicates the line of the bay in 1814. The deed on the other hand speaks with equal authority of that line in 1827. In 1814 (date of map) lot E was many feet from the bay line. In 1827, owing to the abrasion of the shore, it was washed and the south line covered by the bay. Jones vs. Johnson, 18 How., 150.

That the map was not regarded as a sure guide in fixing the front lines of the water lots in 1827 is proved by the resolution of the City Council of 19th February of that year, and the employment of a surveyor to fix the south line of lot E.

But we are not left to conjecture on this point. According to the scale of the map, lot E is over sixty feet in width, and yet in 1827 the City Surveyor, starting from the north line, reached the bay by running fifty-eight feet —— inches.

Again, Touart proves that twenty-five years before his examination high-tide mark was ten or twelve feet from the warehouse which he worked upon; and Theodore Moreno, surveyor, proves that the south line of the lot, according to the calls of the city's deed to Gonzalez, was thirteen feet five inches from the foundation of the house referred to by Touart.

That the water line in front of lot E was found in 1866 to be distant 50 feet from the south line of the lot, according to the city map, only proves that the shifting sands of the sea have been accumulating since 1827 in front of the lot—a fact not at all irreconcilable with the abrasion which occurred between 1814 and 1827 ; for both accretion and attrition are largely influenced by artificial and temporary causes, such even as wharves and rafts.

It follows, therefore, that Gonzalez and those claiming under him acquired as against the city and its assigns a title to all the space between the north line of lot E and the bay, which was the utmost limit of the proprietary rights of the city.

To Gonzalez and his assigns the right of accretion inured, and as the bay receded, as it has done, his south line advanced with the receding tide. Angel on· Tide Waters, 249, 250, 251.

Ordinary high-tide mark separated their property from that of the United States as trustee of the embryo State; and hence there could be no intervening space to which the city could assert title.

The city's deed to Gonzalez refers to no street on the south of lot E; and the resolution of the City Council of 19th February, 1827, shows that a permanent water front was considered a subject for future regulation. The report of the committee of the Board of Aldermen on 4th August, 1827, could not affect Gonzalez's rights acquired on the 19th February, 1827.

The open space between the bay and the lots was only intended to define the road along the coast, such a road as is referred to in Hagan vs. Campbell, 8 Porter, 9, and which is perfectly consistent with the right of alluvion in the proprietors of the lots over which it passes.

The city map is silent in regard to the real character of that open space ; nor is it designated in any document anterior to the deed to Gonzalez as a street or quay ; and yet the presumption that it was such,.in the absence of opposing testimony, might arise. Such was the presumption in connection with

other evidence upon which the courts acted in Barclay vs. Howell's Lessee, 6 Peters, 500 ; Rowan's Ex'rs. vs. Town of Portland, 8 B. Mon., 240. But the Report of the Land Commissioners, Executive Doc., page 75, fixes the character of the space. They say it is " a free passage along the coast without prejudice to the rights of alluvion and avulsion. The adjacent proprietors were entitled to the batture as an' accessory which passed with the principal."

The covenant between the city and Knowles and Blount ; the map laying off the water front into lots ; the deed under which appellants claim ; and the structure erected by them with the sanction of the city, estops the city from setting up a dedication of the open space as a street or quay, and also the appellants who claim under it. Barclay vs. Howell's Lessee, 6 Peters, 508. They cannot rely on a dedication to sustain a deed totally inconsistent with such dedication.

It was insisted by the appellants, in the court below, that the Act of the General Assembly "for the benefit of commerce" does not apply to lot E, because the 2d Section limits the privileges bestowed by the 1st to owners of land extending to low-water mark.

But that construction would make the act inoperative on the tide waters of the State, where commerce would be mainly benefited ; for no riparian owner's boundary extends below ordinary high tide, whilst those on rivers extend to low-water mark.

The 2d Section has reference only to swamp lands, and was intended to guard against the rights of the State.

One part of a statute must be so construed by another that the whole may, if possible, stand. 1 Blk. Com., 62.

A saving totally repugnant to the body of the act is void. Ibid.

A mere false description does not make an instrument inoperative. Broome Max., 136.

These rules of construction carry out the intention of the leg-

islature, and give full force and effect to all the provisions of the act.

Third. The existence of a quay, street, or road along the shore between lot E and the bay, did not authorize the city to lay off the batture or shallows of the. bay into lots and sell them to individuals to be enjoyed as private property.

On 4th August, 1827, the Common Council declared that " the space between the lots and the bay was reserved as *common property* for the use and benefit of the city, and *designed* for the erection of wharves and docks, the establishment of streets, and other *general uses* for the *common benefit.*"

" If the dedication of this ground to public use be established by the principles of the common law, it is of the utmost importance that the accumulations of the vacant space by alluvial formations should partake of the same character, and be subject to the same use as the soil to which it becomes united." New Orleans vs. United States, 10 Pet., 299 ; Geiger vs. Filor, 8 Fla., 325 ; Barclay vs. Howell's Lessee, 6 Peters, 498.

Fourth. The appellants cannot justify the wrong of which the bill complains, under the grant alleged to have been made to Vicente S. Pintado by the Spanish Government.

First. There is no evidence before the court of the existence of such a grant.

The paper in the record purports to be a copy of a copy of a copy made on 18th of October, 1821, in Havana by an officer, who states he returned the original to the interested party, thus showing he was not its custodian.

In United States vs. Percheman, 7 Peters, 85, the court says: " A copy given by a public officer whose duty it is to keep the original ought to be received in evidence." All the subsequent cases in which copies of Spanish grants were received in evidence, the copies were made by the custodian of the original. United States vs. Despline, 12 Peters, 654 ; United States vs. Wiggins, 14 Peters, 334 ; United States vs. Rodman,

15 Peters, 130; United States vs. Despline, 15 Peters, 226; United States vs. Acosta, 1 How., 24.

But here we are offered a copy made by an officer who was not entitled to the custody of the original according to his own showing.

And again, he could not be entitled to such custody under the 2d Article of the treaty between the United States and Spain.

Second. The batture or shallow in front of the city of Pensacola was not grantable by Intendent Rameirez. New Orleans vs. United States, 10 Peters, 662, pages 724–7; Geiger vs. Filor, 8 Fla., 325; Opinion of Coms. Ex. Doc., 74–76; Strother vs. Lucas, 410, page 438.

Such a grant would violate the vested right of the public to free access to the bay from the foot of the streets, the squares, and the road along the coast for business, comfort, and pleasure. And it was to guard these rights that the law in the Novissimo Recopilacion, B. 7, tit. 16, law 1, quoted in New Orleans vs. United States, 10 Peters, 726, was adopted.

Again, it would violate the vested rights of the front proprietors and impair the value of their property. Ibid, 720.

Such a grant by the Spanish crown is without precedent, and contrary to her colonial policy.

Third. The grant contains the limitation that it shall not operate to the prejudice of third parties; and yet it is urged as a justification of a wrong to every front proprietor, and the whole community.

Fourth. The grant of the batture was subject to a condition subsequent, to wit, the building of wharves and bathing-houses, and that condition has not been fulfilled, nor has there ever been an attempt at fulfilment.

The concession embraces six lots in the city of Pensacola, and 10,000 arpents of land, of which the batture of Pensacola is a part, as appears by certificate C.

Conditions are annexed to the concession of both the lots and the land, the language used being on condition of building on

the one (lots), "and cultivating and improving the other" (land.)

The character of the improvement to be made on the batture is fixed by certificate C, which alleges the object of the concession to be the building of wharves and bathing-houses.

.The concession states the conditions generally; certificate C fixes its precise character; and the title in form must be construed with reference to them.

The concession, the survey, and the title in form are parts and parcels of a regular and complete Spanish grant.  Ex. Doc., 7–11.

In order, therefore, to ascertain the true legal import and effect of such a grant, we are not to look at disjointed parts,; for "the law will judge of a deed or other instrument consisting of divers parts or clauses by looking at the whole, and will give to each part its proper office so as to ascertain and carry out the intention of the parties."   Broome Max., 126.

The form of the grant in The United States vs. Arredondo, 6 Peters, 691, was similar to this, and made by the same Intendent.   In that case the court said "the grant is in full property in fee, an interest vested on its execution, which could only be divested by the breach or non-performance of the conditions." Page 353.

The forfeiture of Arredondo's grant was saved by a partial performance, the fact that a complete performance was prevented by the treaty between the United States and Spain, and the additional consideration that its performance was not a matter of interest to the United States.

Here, during a period of half a century, there was no attempt to fulfil the conditions, though they were of the highest importance to the business and comfort of the community.

The ordinance of Morales allowed three years for the fulfilment of conditions.   Art. 4, Land Laws, 2 vol., 235 ; U. S. vs. Hughes, 13 How., 1.

The limit allowed by the common law for the fulfilment of a

condition where no time is specified, is a reasonable time, or at furthest the life of the party. 1 Hilliard Real Estate, 378, § 8.

This court is not clothed with the discretionary authority in the exercise of which the Supreme Court of the United States decided the Arredondo case and others. Nor are the conditions here, as they were in those cases, purely matters of interest to the United States, if any party, but their fulfilment was and is of vital interest to the business and comfort of an entire community.

Holding the grant absolute, and waiving the performance of the conditions, would for half a century have left the city of Pensacola without a wharf or bathing-house, unless erected with public or municipal funds, for private enterprise is expressly excluded by the terms of the grant.

Fifth. The grant does not purport to convey the soil of the batture, but only confers the franchise of building wharves and bath-houses upon it.

As between subjects the words of a grant shall be construed most strongly against the grantor; but in the case of a grant from the sovereign, it shall be construed most strongly against the grantee. Broome Max., 122–3.

In order to ascertain what is granted we must first ascertain what is included in the exception; for what is included in the exception is excluded from the grant. U. S. vs. Arredondo, 6 Peters, 741.

All the rights of the crown are reserved, and the chief of these was the property in the soil as the trustee of the public.

Again, the rights of the public, and even those of the city, to the extent of building wharves *ad libitum* with public or municipal funds, are excepted.

The grant of such a privilege was allowable under the laws of Spain. The King could authorize "building" in public places, provided, however, no one should be injured in his right thereby. New Orleans vs. U. S., 10 Pet., 726.

The franchise has been forfeited by non-user for fifty years.

But if not forfeited, can it authorize the erection of ice houses and other structures, or, in a word, covering the batture with a town, as the grantee or his heirs propose to do?

Even the ownership of a ferry confers no right to build a bridge. 2 Hilliard Real Property, 41.

Sixth. The act of Congress, 23d May, 1828, was a final settlement of all claims arising under the grant.

The act confirms the grant to the extent of the quantity contained in one league square, or 5760 acres, being 3965 less than the grant called for, with the proviso that the residue shall be relinquished to the United States, and what was embraced in certificate C (the submerged land in front of the city of Pensacola) should constitute no part of the league square.

Seventh. That the claim to what is embraced in certificate C was barred on the 23d May, 1829. United States vs. Marvin, 3 How., 620; see 12 sec. act 23d May, 1828, 4 vol. U. S. Stat. at Large, 284.

Eighth. The claim to the submerged land embraced in certificate C falls within the principle declared in U. S. vs. Hughes, 13 How., 1, and ibid 4, that failure to take possession of land granted, or to assert a right thereto for 36 years, as in one case, or for 40 years, as in the other, justifies the presumption of abandonment.

Here possession was never taken by Pintado, his heirs, or assigns. In 1826 he asserted his title before the Land Commissioners, and again for the last time before Congress in 1828.

Both applications were refused, so far as they related to the water front of Pensacola; and that refusal has been acquiesced in by Pintado, his heirs, and assigns, since 1830, a period of 38 years.

This suit does not rebut the presumption of such acquiescence. Blount and Knowles are self-constituted trustees, in no wise connected with Pintado, his heirs or assigns.

Fifth. That either as a riparian proprietor whose individual rights have been violated, and threatened with further violation,

or as a front proprietor peculiarly injured by the infraction of a public and common right, appellee was entitled to apply to a court of equity for the relief for which his bill prays, and which the circuit court granted.

First. The appellee is a riparian proprietor asking for the abatement of a structure, and an injunction to prevent the erection of others, in violation of his rights under the Act of 1856 for the benefit of commerce.

The Act itself gives the right to proceed by bill in chancery ; and the very nature of the rights conferred and to be protected renders that remedy indispensable.

The law gives the riparian proprietor absolute control of the space from ordinary high-water mark to the channel, to enable him to meet the wants of commerce in any way his interest and judgment may dictate.

He may design the space for such purposes as may require it to be kept open, and free from all obstructions, e. g., as a landing-place for rafts. He may design one part for wharves, and another for warehouses; or he may choose so to exercise his rights as to enable him to accomplish all these objects at the same time.

Now, if an ice house or warehouse is built on water which he proposes to keep open or build wharves, ejectment is not an appropriate remedy.

Again, if the erection of such structures is threatened, will any common law action prevent the wrong ?

The removal of the structure in the one case, and preventing the erection in the other, by a proceeding and decree like that in the circuit court, is the only adequate and complete remedy of the riparian owner.

Jurisdiction in cases like this is not a question of authority in the court, but simply one of precedent; and that is settled in this State by Geiger vs. Filor, 8 Fla., 325. The original bill in that case was to abate a nuisance, and an issue having been ordered, complainants amended their bill by presenting a case

like this under the Act of 1856, which the circuit and supreme courts fully heard and determined on its merits.

Second. Complainant is a front proprietor, peculiarly injured and threatened with further injury, by the appropriation of the batture to private purposes as an incident to a road along the coast.

Barclay vs. Howell's Lessee, 6 Peters, 507 ; Geiger vs. Filor, 8 Fla., 325 ; Dixon vs. Irwin, 9 How., 10 ; 2 Story, Eq. Jr., 926-7, show that a street, and much less a road, along the coast, cannot authorize the erection of structures inconsistent with its use ; and that a bill for the abatement or prevention of the injury is the appropriate remedy, either against the corporation or the agent who commits the wrong, at the instance of a party specially injured.

Third. The appellee is a corporator peculiarly injured by an abuse of its powers by the corporation of Pensacola, to the injury of all its citizens.

The agreement between the city and Knowles and Blount, and the resolution requiring the city attorney to institute suit against the heirs of Pintado, in connection with all the objections existing to the validity of the grant, create the presumption of an effort to unlawfully deprive the city of her water front.

First. No front proprietor was admitted as a party to the agreement.

Second. Blount and Knowles were self-constituted trustees of the "heirs of Pintado," whose names are not stated, and of the death of whose ancestors there is no evidence.

Third. Knowles was a self-constituted trustee, and Knowles offered, and by his vote carried, the remarkable resolution.

Fourth. The city attorney, contrary to his judgment, is required to oust the city in favor of a party who had not been in Florida since 1816, and make the city a plaintiff, when her just and legal position was that of a defendant in ejectment.

Fifth. The city attorney was virtually required to waive the statute of limitations ; the force and effect of the decision in The

United States vs. Marvin, and that of United States vs. Hughes; and to ignore the fact that the existence of the grant to Pintado was more than questionable; that if it did exist it was illegal, so far as it covered the batture, for want of authority in the officer who made it; that it was founded on conditions never fulfilled; that it was made without prejudice to the rights of the city; that it was a grant of nothing more than a franchise, and in terms subordinate to the rights of the city; and lastly, the settlement by the United States thirty-eight years ago, and by an act which fully protected the rights of the city and those of her citizens, so far as they were affected by the grant.

The map of the batture made pursuant to the agreement shows how vast was the injury contemplated against the public, and the front proprietors, of whom the appellee was one, and the city the largest, as the owner of the public squares in trust, and (to use her own language on 11th August, 1827,) "for the common benefit."

The railroad was involved in the scheme to secure supporters, and foil accusation by an affectation of public spirit.

Injunction will be granted against corporations to prevent injury to others by an abuse of the powers granted to them. 2 Story Eq. Jr., § 927; Rowan vs. Portland, 8 B. Mon., 232. And Barclay vs. Howell's Lessee, 6 Peters, 500, shows that the remedy extends to the agent employed to accomplish the wrong.

WESTCOTT, J., delivered the opinion of the court.

Pinney, in the court below, filed his bill against Geo. J. and Sevilla Alden, in 1866, alleging that he was the "owner *of so much of lot E*, in the city of Pensacola, as lies east of a line beginning on Recova street ninety feet from Commendancia street, and *running south to the bay;*" that this lot was formerly the property of the city of Pensacola, and that on the 16th March, 1827, the city, in exchange for another lot, conveyed

that *portion of lot E*, described above, to one Manuel Gonzalez, from whom, by several mesne conveyances, Pinney derives title; that at the time said deed was executed by the city to Manuel Gonzalez, the southern boundary *of the lot was the bay*, and that he was entitled to all the rights and privileges of a riparian owner; among which he alleges are those of accretion, free access to the harbor from the lot, an unobstructed view, a free circulation of air, as well as all the other privileges appertaining to a lot fronting on the bay.

Pinney alleges that in disregard of these, his rights, the defendants have built an ice house in the *shoal water*, directly in front of his lot, and about one hundred and fifty feet from the situation of the front door of his storehouse, which was destroyed during the late war; that they claim other parcels of the submerged land in front of his lot, upon which they intend to erect, or authorize the erection of, other structures, which will still further irreparably impair his rights.

He alleges further, that he and those under whom he claims, have been in actual possession of said lot E, and all the rights and privileges incident to a lot fronting on the bay, for a period of forty years; that during all this time and before, the beach and bay in front of said lot were free from obstruction until this ice house was erected.

The bill prays that defendants may be ordered to remove the ice house, and for a perpetual injunction against erecting other buildings, or *structures of any kind*, in front of complainant's lot.

The answer under the statute sets up, by way of demurrer, that the matters stated in the bill may be tried and determined at law, and that complainant is entitled to no relief in a court of equity. It denies, upon information and belief, that complainant is a riparian proprietor; avers that his lot extended south from Recova street only fifty-eight feet eight inches; that it never extended to or was bounded by the waters of the bay; but that, on the contrary, at the time of the execution of the deed of the city to Gonzalez, in 1827, there was a space of more than

eighty feet in width between lot E and the bay; that said space had existed from time immemorial, and had been used as a street or highway; that Gonzalez, at the date of his purchase, was restricted by well-defined metes and bounds; that the lot was not bounded by the bay, and that complainant has no right to the soil under the waters of the bay, upon which the ice-house is constructed.

Defendants admit the construction of the ice-house, and allege that they are the owners of the soil upon which the ice-house is constructed, as well as other lots, upon which they claim the right to build other structures, by virtue of "a purchase from the city of Pensacola and the heirs of Vincente Pintado, deceased," and that said heirs held and possessed the aforesaid land by virtue of a valid Spanish grant.

After evidence and hearing, the relief prayed was decreed; and from this decree an appeal is taken to this court, by the defendants in the court below.

The case is here without any formal assignment of the grounds upon which a reversal of the decree of the court below is prayed, and the court is thus constrained to treat the case as it was argued by counsel.

Appellants urge that the demurrer was not disposed of in the court below, and that for this reason the case should be remanded, as well as that the demurrer was well taken and should have been sustained.

Under the statute of this State, the defendant is authorized to set up special matter by way of answer, and if in his pleading he prays the same benefit from it as if he had pleaded it or demurred to the bill, he can have the benefit of it in most cases at the hearing. There is a class of cases, however, among which are such as where certain objections are taken as to parties, where this objection must be disposed of *in limine*.

In the other cases, and where the practice is to urge it at the hearing, it is presumed here, without any special allusion to the matter in the body of the final decree, that it was urged,

and that it was considered by the court in arriving at its con-clusions. In many cases, in fact in most cases, *ex abundante cautela*, it is usual to insert in the beginning of the answer that defendant prays the same benefit of the several special matters set up therein, in the same manner as if he had demurred or plead to the bill. Often, in this class of cases, the pleader has little or no confidence in this defense, and nothing further is said at the hearing. This would be an abandonment, and it is stated by the appellee, without express denial by appellant, that this demurrer was not urged at the hearing below. All this, however, is immaterial in this case. The objection here is, that there was adequate remedy at law, and we can consider this matter whether raised by demurrer or not. 19 How., 278. In this case, however, we know of no common law remedy or action which would at once prevent the erection of structures upon his land in the event complainant was a riparian proprietor, and this structure and the contemplated structure was an obstruction to the navigation, the case being that free access to the harbor is obstructed, as well as private injury, as stated by the bill. He might perhaps recover damages, but he should be entitled by the aid of the courts to prevent special damage occasioned by continued trespasses, if it is threatened, and he is a riparian proprietor. In a case of this character, where an undisputed possession of forty years is alleged, and where in an appellate court the claim of title which complainant sets up to the *locus in quo* is met in argument, not by establish-ing or urging title in the defendants, or in those from whom their rights are derived, but by a simple denial of the extent of the boundaries of complainant, and of his alleged riparian pro-prietorship, the jurisdiction should attach. The principal defense made in argument here is, not that there was title in the heirs of Pintado, or in the city, but with but slight allusion to the title of these parties, or attempt to sustain them, that the property of complainant was limited by well-de-fined boundaries, and was never bounded by ordinary high tides in calm weather.

Riparian proprietors, too, under the Act of 1856, have a title coupled with a trust for the benefit of the public, (2 Story's Eq., 927,) and this seems to be the only view consistent with the case of Geiger vs. Filor, (8 Fla., 325,) upon the subject of jurisdiction, and we are not disposed to establish a new rule, although the old one may be questionable. Even then, could the demurrer be available here, it should be overruled.

This leads us to the consideration of the case upon the proofs, and the first question to be determined, is: Has the complainant established that the "southern boundary of the lot" conveyed to Gonzalez on the 19th February, 1827, from whom he derives title, "was the bay," or that it extended to the line of ordinary high tides in calm weather at that time? What may be the effect of the reservation of lot E for a market house and storehouses, as designated on the plan of the Cabildo, we do not determine, as no point is made of it by defendants, and we treat the case as though an absolute and proprietary right is in the complainant to whatever passed under the deed.

The question of boundary here is a fact to be determined by a consideration of the whole evidence. The portion of lot E conveyed is described in the deed as "the easterly part of the new market lot, where the flag-staff formerly stood, and marked by the city surveyor, ninety feet in front on the bay, and fifty-eight feet —— inches in width, agreeably to the allotment of the Cabildo and the new plan of the city." This is followed by a covenant that Gonzalez, his heirs and assigns, shall forever enjoy the peaceable and quiet possession of the premises as against the city and all persons claiming under it. This deed was executed by the mayor of the city by virtue of an ordinance passed on the 19th February, 1827, as follows:

An ordinance to carry into effect an arrangement with Mr. Manuel Gonzalez.

*Be it ordained by the Board of Aldermen of the city of Pensacola,* That on condition of Mr. Manuel Gonzalez conveying.

and delivering to the city of Pensacola the old market lot now in his possession, the mayor is hereby authorized to convey to the said Manuel Gonzalez the eastwardly part of the new market lot, where the flag-staff formerly stood, and marked by the city surveyor, ninety feet in front on the bay and fifty-eight feet —— inches in width, agreeable to the allotment of the Cabildo, and the new plan of the city.

It is apparent from the title of this ordinance that it was passed to consummate an arrangement previously made.

On the same day the following appears on the minutes of the Board of Aldermen:

*Resolved*, That the city surveyor be requested to survey and make an accurate plan of the building-lots, as they now stand, and also a plan of the original grants on the *bay front*, from the east corner of the market house to Villaseca's corner, in order to enable the City Council to determine on a *permanent bay front* and building line.

The subsequent action of the board of aldermen shows that this resolution was passed to devise means to stop encroachments by front proprietors upon an open road or street between the proper limits of their lots and the bay.

Agreeably to the plan of the Cabildo and the new plan of the city, the map referred to in the deed, lot E was contained within defined lines. It was bounded on the north by Recova street, on the east by Commandancia street, on the west by a street or space not named, and on the south by *an open space between the south line of the lot and the water, for a distance of at least fifty or sixty feet, the lot being a parallelogram.* This map, alluded to in the deed to Gonzalez in 1827, was made in 1814.

It is insisted that the call of the deed is for "ninety feet in front on the bay," and that this is a call for the water as a natural boundary; that it must control the call for fifty-eight feet —— inches, which is a call for distance, and that the ref-

erence to the new plan of the city is simply to indicate locality and not boundary.

"It is a general principle that course and distance must yield to natural objects. The reason of the rule is, that 'all lands are supposed to be actually surveyed, and the intention of the grant is to convey the land according to that actual survey;' consequently if there are marked trees and marked corners, or other natural objects, distances must be lengthened or shortened and course carried so as to conform to those objects. It is conceived to be the general intention of the grant to convey the land actually surveyed, and mistakes in course or distance are more probable and frequent than in marked trees, mountains, rivers, or the natural objects capable of being accurately described." 6 Fla. Rep'ts, 506.

While this is true, it is no less well established, that a plat of a town referred to as containing a designation of boundaries, fixes them as satisfactorily as any natural objects; and if in such case one natural boundary, a river for instance, is inconsistent with all the other designated boundaries, according to the map, the plan or map will control unless it appears satisfactorily that the natural call has not been inserted through inadvertence or mistake.

It is not correct, however, to conceive that the call for "ninety feet in front on the bay" is or can be nothing else but a *call for the water of the bay as a natural boundary.* These terms indicate aspect as well as boundary; for instance, in the second line of appellee's brief they are used as indicative of aspect, and so are they repeatedly used in the record evidence embraced in this case. Independent of the other calls, the argument is at least as good to sustain the one position as the other.

These terms, therefore, must receive that construction and signification which is most consistent with the other calls and the evidence in the case. While the reference to the new plan of the city and the allotment of the Cabildo indicates locality, as was urged by appellee, yet we cannot sanction the view

that it is to indicate *locality alone*, in the sense intended.    This reference certainly gives us the northern and eastern boundary. The call is for "the easterly part of the new market lot, where the flag-staff formerly stood," and the other calls are only further descriptive of its boundaries and width.    When we have found upon this plan the new market lot, we have certainly ascertained the eastern boundary of this lot; and so also have we in like manner the north boundary, for the north and east boundary of the lot sold to Gonzalez cannot be other than the northern and eastern boundary of the lot agreeably to the plan on this map.

This is the only method in which we can fix the north and east boundary of the lot; and this, too, seems to be the view of the appellee so far as the north boundary is concerned, for he claims, in his bill, to own "*so much of lot E* in the city of Pensacola as lies east of a line beginning on Recova street, ninety feet from Commandancia street," and Recova street is the north boundary of lot E, and a straight line.

In Barclay vs. Howell's Lessees, 6 Peters, 500, the deed called for the lot by its number as marked on the plan of the town, and bounded by Front street, the river Monongahela, and lots number 182 and 184.    The court, in speaking of the effect to be given to the reference to the plan, say, "the plat of the town, which is referred to as containing a designation of the boundaries of the lot, fixes these boundaries as satisfactorily as any natural objects.    So in this case, the northern and eastern boundary of the new market lot contain a designation of the boundaries of the property sold to Gonzalez as satisfactory as if natural objects were posted at each angle or termini.

We thus see that the northern boundary is a straight line of ninety feet, commencing from a point on Commandancia street, and running west on the southern boundary of Recova street, and we come now to ascertain the length of the eastern boundary.    The deed in the first place restricts the whole body of the grant to the "*easterly part of the new market lot*," and

where is the authority to extend the boundary of the grant beyond the marked eastern boundary of lot E? But this is not all. The words of the deed are, "and marked by the city surveyor, ninety feet in front on the bay, *and fifty-eight feet —— inches in width.*" Now if the plan of the Cabildo is to govern this eastern boundary, to reach the bay must be at least one hundred and ten feet or more. Here is a call for a southern boundary of ninety feet in front on the bay, which if these terms denote aspect makes a consistent whole, while if they indicate a water boundary, and the plan of the Cabildo governs, you extend a line to a distance of one hundred and ten feet, which, the deed expressly says was marked by the city surveyor to be fifty-eight feet —— inches. We must accept the consistent construction.

Again, it is urged that these apparent inconsistencies between the plan and a water boundary are explained, and the explanation is that the plan indicates the line of the bay in 1814, while the deed on the other hand speaks with equal authority of that line in 1827, and that in 1827, owing to the abrasion of the shore, it was washed, and the south line of lot E was covered by the water.

It has not and could not well escape the attention of the court, that while there is one witness examined in this case who testifies fully that no structure has been placed upon the shoal water in front of this lot between the year 1815, one year after the plan of the Cabildo, and the year 1866; and while there are others who must be acquainted with the position of the waters of the bay between 1815 and 1827, yet there is not a particle of positive testimony to establish an abrasion of the shore between 1814 and 1827. The testimony of Moreno shows that, according to the *scale of the plan*, the distance from the north boundary of lot E to the south boundary, as marked on the map, is sixty feet, while the deed describes it as fifty-eight feet —— inches, and upon this difference a presumption is constructed that between 1814 and 1827, owing to the abrasion of the shore, the line of the water had encroached upon the south boundary of lot E,

and that when the surveyor ran his line from the north boundary towards the south boundary in 1827, he struck the water at fifty-eight feet —— inches, and thus the words " *in front on the bay* " indicate a water boundary. This is certainly a violent presumption in the absence of even the slightest particle of testimony going to establish an abrasion, or anything like a washing away of the soil, between 1814 and 1826 ; nor is the existence of even one of the artificial or temporary causes generally producing such results established, although it is alleged they may have existed. Besides, as the width of the lot was never marked on the plan of the Cabildo, and the surveyor, no doubt, run the line actually in 1827, and did not estimate the distance according to the general scale of the map, it is not very remarkable that there should be a slight difference between a line *actually run* by him in 1827, and an estimate *according to the scale* in 1866, especially when upon a reference to the plan of the Cabildo a difficulty in determining the initial and terminal points of the line with entire certainty is very apparent.

While the testimony of Touart, in the record, who seems to have known nothing of the metes and bounds of the lot, is not as positive or explicit as it might be, yet from his testimony, uncontradicted, it might be admitted that in 1842, (a date more remote from the deed than the date of the plan,) the water did strike the south boundary of the lot, and still it is not seen how this could make the appellee a riparian proprietor in 1866, or Gonzalez in 1827 ; but even if that was the date in issue, we could not come to an affirmative conclusion upon the testimony of this witness, with such other contemporary proof as is in this case. A reference to the almost contemporary proceedings of the board of aldermen, and the report of the commissioners in 1825, leaves no room for a reasonable doubt that in 1827, at the date of the execution of the deed to Gonzalez, there was a road or open space between the lots of the city fronting on the bay and the water. The commissioners in 1825, in speaking generally of the lots fronting on the bay, refer to " a public road on the beach," and

there was in 1866 about the same distance from the south boundary of lot E to the water as there was in 1814.

We have, in the record, the following report of a committee of the board of aldermen, of the date of August 4th, 1827 :

" The committee who were directed by resolution of the 16th July ' to examine the size and dimensions of the water lots,' and also to inquire into the ' expediency of establishing a building line on the bay ' beyond which no building should be erected, and declaring a water street in front of said line; and likewise what disposition should be made of the space in rear of the building line; and further, if any encroachments have been made by persons who have built upon water lots, how they are to be disposed of, beg leave to report :

" Your committee being apprised of the difficulty and importance of this subject, with the deep interest that is involved in the questions that may grow out of the investigations of the rights of the corporation and those of individuals, have bestowed upon it a careful and attentive examination so far as their means of information extended. It is apparent, upon the English plan of Pensacola, *that the water lots were never designed to extend to the margin of the bay ; the same thing is equally clear upon the Spanish plan.* Both these plans show clearly and distinctly that the space between the water lots and the bay was reserved as a common property for the use and benefit of the city, and designed for the erection of wharves and docks, the *establishment of streets,* and other general uses for the common benefit. If this space between the *true lines* of the water lots and the building line in front of the city be the *common property of the corporation, every encroachment upon it is an injury done to the common interest, and should be subject to its consequent damages.*

" To carry into full effect the *plan of the city,* and to maintain the ground already contended for that the bay should be kept open for common use and common benefit, Mansfield street according to the English, Zaragossa according to the Spanish plan, was made the *base of the water lots.* Agreeably to the first plan,

the water lots were laid out 80 feet front, and extending towards the bay 170 feet, with garden lots corresponding to each of 105 by 208 feet. Those grants by water lots were made by the British government in the year 1765. After the Spaniards be-came possessed of the city, nearly all of the English titles to the water lots were forfeited, and consequently became Spanish property. The Spanish adopted the same plan of basing the water lots upon Zaragossa street, but at least some of them did not extend towards the bay. If these water lots had extended from Zaragossa street to the water's edge, or from the margin of the bay to Zaragossa street, no claim could be set up by the corporation for *the space between the true lines of the lots and the building line*, as already alluded to; but as the facts of the case are, so will be the result. It appears very clear to your committee that this space belongs to the corporation as an interest in common to the inhabitants of the city, and that all that can be asked by the individuals claiming water lots is the full extent of their lots according to their respective grants; for by what rule of right can an individual ask and claim that which has not been granted to him, or sold to him, nor for which he has paid his money? The zigzag appearance of the present building line on the bay is of itself sufficient to convince your committee of the necessity of establishing a street and building line on the bay, beyond which no building shall be erected."

The committee, then, after recommending a building line, further advise that the space between the true lines of each water lot, according to its grant, and the building line referred to, be paid for by the individuals owning back of it in improvements to be done upon the line of Water street, &c.

With this report an ordinance is submitted to accomplish the end desired. The mayor disapproves the ordinance, but he affirms in what he states the general views of the board of aldermen as to a street on the bay front.

The memorial, in the record, is a protest against any action to *straighten* the *road* along the bay. Its language is, that such

action will be "extremely injurious to the public by straightening the wagon road, and greatly embarrassing the most commercial part of the city."

It needs no argument to show that the fact that the southern boundary of lot E reached the water in 1827, is inconsistent with these almost contemporary expressions. They allude to no abrasions of the shore, and no such changes in the line of high tides as appellee contends for. It would be little less than absurd for the city to be urging a permanent line for a bay front, with an open space between the lots and the bay, and yet be selling lots with a water boundary, and giving a covenant for a quiet and exclusive possession of grounds which were, in their judgment, dedicated to the public.

A complainant seeking relief in a court of equity must produce "that degree of certainty, based upon appropriate evidence, either positive or circumstantial, which creates a moral conviction in the mind of the court" that the facts are as he alleges, or he cannot have the relief he asks.   7 Fla., 144–5.

Our conclusion is, that the complainant has *failed to prove* that Gonzalez was a riparian proprietor in 1827, or that complainant in 1856 had a water boundary, and this whether the act of 1856 vests the rights therein conferred upon parties other than "those owning lands actually bounded by and extending to low water mark," or not, a question which is not determined.

The case made by the bill is that of a riparian proprietor strictly, but being most ably argued in other respects, by both counsel, we consider it in those respects.

This street or space between the southern boundary of lot E being subject to the use of the public, it is insisted that the erection of this structure, at the point designated in the water, is such an interference with this right of the public and his right, as to vest the appellee with an equity to have it removed. Without determining any question of jurisdiction in the event it was held that it was an interference with any public right, it is enough to say that we cannot see how, in fact—and that is

the point to which our inquiry must be directed—the construction of this house at a point considerably distant from the road or street, and not immediately bordering on it, can interfere with any right which the individual may have to the use of the road, or that his property is impaired or injured by any misuse of the road.

If the construction of this building, at this distance from the south boundary of the street or road, produce such results, then it is not perceived what could modify the principle when buildings are constructed within the same distance north of the street.

Again, it is insisted that, as a front proprietor, he is entitled to have this obstruction removed. Whether the title to the soil under the water between the southern boundary of the road or street and the channel of the bay is in the heirs of Pintado, or whether, not being in the heirs of Pintado, the dedication of this road or street (bounded as it is with the water of the bay) to the use of the public anterior to the incorporation of the city, under the circumstances and at the remote period of its dedication, vests the title to this passage or road in the city upon its subsequent incorporation, or whether the city has title to this submerged soil under the acts of Congress, or whether, having title to the soil of the passage or road, and being thus the owner of lands "actually bounded by and extending to low water mark," within the meaning of the statute, the city by virtue of this ownership and the act of 27th Dec., 1856, became vested with title to all the land covered by water as far as to the edge of the channel, with the right and privilege to build wharves into the bay, and do whatever else may be for the benefit of commerce, are all questions which it is unnecessary for the decision of this case to determine; and this court would be justly subject to censure should it volunteer the results of its investigation of these subjects.

Whatever rights Pinney has in reference to the space from the channel to the southern boundary of the passage along the

coast, do not result from any *title to the soil in him*, and these rights, therefore, whatever they are, must exist independent of title; and whether the title be in the city, in the heirs of Pintado, or in Alden, the rights of Pinney are the same.

Wherever the title to this soil is, whether it be in the city, or the heirs of Pintado, or in the State, it cannot, under existing laws, be used in any event to obstruct navigation or commerce. If the grantees of the State hold it, it is coupled with this trust, and if it is put to such use, or such use is threatened, there are circumstances under which complainant can properly seek a court of law or equity to redress injuries. If this ice-house, or any other structure which defendants intend to construct, will be an obstruction to navigation, a hindrance to commerce, or impede or transgress the rights of the public in this respect, the remedy to correct this public evil, while it exists in the State courts, is not at the suit of an individual citizen. He can only seek a court of law or equity in cases of special damage to himself. Such special damage, in case of a public nuisance, must be beyond and in addition to that which falls alike upon all, and he must seek relief in a court of law or equity, as the nature of his special injuries and the remedies for them should determine to be appropriate. 9 Howard, 28; Ang. on Tide Waters, 119, 120, 121.

In this view, what character of case have we here presented upon the pleadings and proofs? The rights which are claimed to be affected are "the right of accretion, free access to the harbor without let or hindrance, an unobstructed view, a free circulation of air, as well as all the other privileges appertaining to a lot fronting on the bay."

The particular act or grievance set forth is, that defendants have built an ice-house in the shoal water directly in front of his lot, about one hundred and fifty feet from the point where was situated the front door of his storehouse, which structure was destroyed during the war, and that the defendants claim other parcels of the submerged land in front of his lot, upon which it

is intended to erect other structures, which will still further irreparably impair his rights. The answer admits the erection of the ice house, and claims the right of erecting buildings upon the other lots in front of the lot of complainant, and a reference to the deed and map in the record shows that the other lots claimed by Sevilla Alden occupy about the same relative position to the property of Pinney as the one upon which the ice house has been constructed.

The erection of this structure by defendants is a mark of title and of exclusive enjoyment. A mere question of title is one which a court of equity should not try. 19 How., 278. Beyond the simple erection of this structure there is but little evidence as to the character of the structure. There is nothing but the deed, which gives its dimensions. The *individual* at common law has no right, independent of the question of injury to himself, to have such a structure removed. Such soil was the King's, and he could demolish or seize the structure, the only limitation upon his authority being that in case it was a public nuisance the crown could not license it. Subject to whatever modifications this principle may have undergone by virtue of the legislation of 1856, it is presumed the State may proceed, as a general rule, in like manner by information or bill.

All obstructions to navigation not occasioned by misfortune or inevitable accident, and without any fault on the part of the owner, and which are not authorized by the Legislature, are public nuisances, and as such, subject the authors to indictment. Russell on Crimes, 274. Yet what is *in fact* such an obstruction to commerce is not so clear. Buildings in the waters of navigable bays are not *ipse facto* nuisances. Whether they are so, is a question of fact, to be determined in each case, and when *especial damage* is proven, an action on the case for such particular damage may be maintained by the individual. 1 Hill, So. Ca., 365; 3 Dowling, Pr. Cases, 61; 4 Watts, 437; 4 H. & McH., 540; 6 Pick., 94

It is also true that a court of equity may interpose by injunc-

tion in cases of alleged apprehended irreparable mischief; but there must be something more than a speculative injury to invite its preventive and corrective power.   6 Pick., 94; 21 Pick., 344; 9 How., 10.   Were the complainants in the court below riparian proprietors, with the peculiar incidents attaching to that property under the statute, we have seen that the expressed intention of further trespasses and injuries, with the other circumstances of this case, among which is a possession of lot E for forty years, would be sufficient to give a court of equity jurisdiction.    12 Peters, 95.   But this is not the case here. There is no right of accretion in Pinney to be disturbed.   Should it clearly appear that free access to the harbor was obstructed, this would not of itself give him a standing either in a court of law or equity, unless he presented a case of special damage, and then the nature of the threatened injury would determine the jurisdiction.

The claim of an unobstructed view and free circulation of air cannot prevent the building of structures at this distance, and there is no such case of obstruction here as comes within the authorities.    There is no evidence in this record which enables the court to know anything of the distance of the channel from this house, and no obstruction to the navigation of the bay is proved.

It is not made to appear that appellee has suffered any such special or irreparable damage, or that any injury is threatened, which would call for the intervention of a court of equity.    21 Pick., 344; 9 How., 27; 12 Peters, 91; Ang. on Tide Waters, 120–121; 19 Ves., 616.

If, independent of the question of riparian ownership and the requirements of commerce, the complainant has a right to have this structure removed, and to prohibit the erection of "any other structures," then even wharves, which facilitate commerce, would be a violation of this right.    Ang. Tide Wat., 196–197. The bill should have been dismissed upon the hearing.

It is therefore ordered, adjudged, and decreed, that the decree

in this case is reversed and set aside, and that the cause be re-manded for further proceedings, in accordance with this opinion.